David WRIGHT, Plaintiff,

v.

KEOKUK COUNTY HEALTH CENTER and Chad Wolbers, Defendants.

No. 4:04–CV–40436.

United States District Court, S.D. Iowa, Central Division.

Nov. 22, 2005.

James E. Brick, Matthew Sean Brick, Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, PC, Des Moines, IA, for Plaintiff.

Gayla R. Harrison, Harrison, McKay, Moreland & Webber PC, Ottumwa, IA, for Defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

GRITZNER, District Judge.

Currently before the Court is Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment. The Plaintiff, David Wright ("Wright"), is represented by James Brick and Matthew Brick. Defendants Keokuk County Health Center ("KCHC") and Chad Wolbers ("Wolbers") are both represented by Gayla Harrison. The matter came on for hearing on October 5, 2005, and is fully submitted for ruling.

### SUMMARY OF MATERIAL FACTS

Defendant Keokuk County Health Center is a county hospital organized under chapter 347 of the Iowa Code. Defendant Chad Wolbers was the chief executive officer of KCHC. Plaintiff David Wright had served as interim CEO before Wolbers accepted the position, but during all times relevant to this action, he was the chief financial officer of KCHC.

KCHC provides ambulance service to Keokuk County. The ambulance staff

members are allowed to sleep in the hospital when they are not on call, but KCHC did not have a defined sleeping area for the staff so they used the ambulance cots or empty hospital beds. Dan Glandon ("Glandon"), the Director of Ambulance Services, sought to acquire a set of bunk beds for the ambulance department to remedy this situation. Glandon's normal spending authorization was limited to $100, but he asked Wolbers for permission to exceed his normal purchasing authority to acquire new beds.[1] The Defendants claim Wolbers authorized Glandon to spend up to $200, but Glandon and Wright assert the amount of money discussed was in the range of $500 to $800.

Glandon submitted an affidavit stating that he was unable to find beds sturdy enough to hold the ambulance staff. He knew Wright had a set of wooden bunk beds in his children's bedroom, which he thought would be suitable. Wright and Glandon discussed a transaction whereby Wright would purchase a new set of beds for his home, and his existing wooden beds would be brought to the ambulance center. Wright and Glandon claim they discussed this openly in front of hospital staff, but Defendants say no other staff members could be found to corroborate this claim. It is undisputed that Glandon had authority to purchase beds and that Wright had the authority to use the KCHC credit card for purchases benefiting KCHC up to $500.

On December 29, 2002, Wright purchased metal bunk beds at a furniture store in Ottumwa. The $500 beds were purchased with KCHC's credit card. No tax was paid on the transaction, as it was processed using KCHC's tax identification number. According to Wright, he made this purchase at the direct request of Glandon and on behalf of KCHC. Glandon testified that he knew Wright was going to purchase the beds using the KCHC credit card but denies he instructed Wright to do so.

The new metal beds were taken directly from the furniture store to Wright's home in Sigourney, Iowa. The wooden bunk beds from Wright's home were taken to the KCHC ambulance department. Glandon testified in his affidavit he was pleased with the exchange and thought it saved KCHC money. Neither Glandon nor Wright could recall informing Wolbers of the exchange or its terms, though both said it was unnecessary because Glandon had been given authority to purchase beds.

Heather Smithart ("Smithart"), a KCHC employee, made a duly authorized purchase on the KCHC account (not the credit card) at the same furniture store, where she learned of the bunk bed purchase. Wright's wife, Stephene, had previously informed Smithart the Wright children had received new bunk beds and their old beds had been donated to KCHC.

Around December 31, 2002, Smithart told Wolbers what she had learned, and Wolbers began an investigation. He contacted the furniture store and inspected the beds in the ambulance department. He discovered a set of black metal bunk beds had been purchased using the KCHC credit card and tax identification number, but a set of wooden bunk beds were in the ambulance department. Wolbers spoke with private counsel and the Keokuk County Attorney and decided to suspend Wright. He called Anthony Latcham

---

1. The minutes of the Directors Council in the record show that the normal spending structure at KCHC allowed Directors Council members to spend up to $100 without approval. The CFO could spend up to $500 and approve expenditures up to that amount. The CEO could spend or approve spending up to $10,000. Amounts over $10,000 were to be approved by the Board of Directors.

("Latcham"), the president of the KCHC Board of Directors, to arrange a meeting with Wright. He also called Sonya Wehr ("Wehr"), who oversaw human resources and accounts payable. She confirmed the existence of an invoice for the metal bunk beds and a receipt signed by Wright upon which he had written "Ambulance". Wolbers' investigation did not include a discussion with Glandon. Wolbers first spoke to Glandon after Wright's suspension.

Wright, Latcham, and Wolbers met on January 10, 2003, to discuss Wright's suspension. According to Wright, Wolbers asked him if he had made any recent purchases, and Wright described his agreement with Glandon to exchange bunk beds. Defendants claim once Wolbers began questioning Wright, he immediately asked if the meeting was about the bunk beds. Defendants imply this demonstrates a consciousness of guilt or wrongdoing on Wright's part.

After this meeting suspending Wright, Wolbers met with Wright's wife, Stephene, who was a housekeeper at KCHC. According to Wolbers, he called this meeting to ensure Stephene did not hear about her husband's suspension through the rumor mill, and also so Wolbers could investigate what Stephene knew about her husband's purchase. Stephene told Wolbers she did not know the bunk beds in her home were purchased using the KCHC credit card.

Next, Wolbers and Latcham met with both the KCHC Directors Council[2] and personnel that directly reported to Wright and notified them of Wright's suspension. Wolbers testified he did not mention the specific reasons for the suspension, namely misuse of the credit card, though exactly what was said in this meeting remains

unclear. After the staff meetings, Wolbers and Latcham also met with Glandon separately. Glandon was upset that Wright was suspended and did not think a suspension was warranted. Glandon said he told Wolbers the trade was his idea and that Wright should not be punished, but Wolbers denies hearing Glandon take responsibility.

On January 13, 2003, Defendants terminated Wright's employment. Wolbers testified in his deposition that Wright was terminated for misusing the credit card and denied the bunk bed exchange alone was the reason for termination, although he said the bunk bed exchange was wrong. Defendants mailed Wright a letter notifying him of his termination, which he received the following day. Glandon received no discipline as a result of the bunk bed exchange.

On January 14, Wolbers called a meeting, before speaking to Wright, and informed KCHC staff that Wright was going to be terminated because he had misused the KCHC credit card. The undisputed facts show that Defendants told the following people that Wright had misused the KCHC credit card: Lynn Olson (CEO of Ottumwa Regional Health Center and Wolbers' mentor), Stephene Wright (Wright's spouse), Mike Trachta (former KCHC CEO), Sonya Wehr (responsible for accounts payable and human resources), Gayla Smith, Diane Robuck, LaVonne Bloem, Jerlyn Bowers, Heather Smithart, and Bill Halleran (all KCHC employees).

Defendants also reported the incident to the Keokuk County Attorney. Wright characterizes this as reporting a crime, though he was never charged with a crime.

2. The pleadings refer to the KCHC Board of Directors or Board of Trustees, and the Directors Council or "directors." The latter is a group consisting of Dan Glandon, Director of Ambulance Services; Bill Haloran, Director of Facility Services; and Jerlyn Bowers, Director of Patient Care Services. For clarity, the Court will refer either to the Board of Directors or the Directors Council, as appropriate.

Defendants dispute that Wolbers ever used the term "crime", but in Wolbers' deposition he said the purpose of contacting the County Attorney was to see "what I should do in terms of pursuing this as a criminal matter."

On January 30, 2003, the KCHC Board of Directors met in a closed session. Wright and Glandon addressed the group and offered their explanation of the events and encouraged the Board to reconsider Wright's termination. Wright also submitted a written statement to the Board, but his termination was ultimately upheld.

Defendants had the used bunk beds appraised by an auction house in Sigorney, Iowa, and the result was a fair market value of $100 to $125.

After his termination, Wright sought new employment. He disclosed the circumstances of his termination to one employer, First Resources, and two prospective employers. Wright is currently employed outside the health care administration field.

Wright filed a Complaint in this court on August 12, 2004, alleging that Defendants deprived him of a liberty interest without procedural due process in violation of the Fourteenth Amendment; that the communications of the Defendants from the investigation until after his termination have defamed him and forced him to defame himself to others; that the Defendants tortiously inflicted emotional distress upon him; and that the Defendants breached his employment contract by failing to provide notice or severance pay prior to his termination.

Defendants filed an Answer on September 22, 2004. Therein, they denied depriving Wright of any liberty interest without due process of law and denied that any of their statements defamed Wright or forced him to defame himself. Defendants asserted the affirmative defenses of truth and qualified privilege to the defamation claims. Defendants further state Wright's allegation of intentional infliction of emotional distress fails to state a claim upon which relief can be granted and that there was no breach of the employment contract because Wright was terminated for gross misconduct.

On April 29, 2005, Wright filed a Motion for Partial Summary Judgment as to his claims of defamation and violation of procedural due process. Wright claims that the Defendants' statements were defamatory per se and the defenses of truth and qualified privilege do not apply, and that he was not provided with a pretermination hearing. The Defendants filed a resistance to this motion on June 24, 2005, prompting a reply from Wright on July 1, 2005.[3]

Defendants filed a Motion for Summary Judgment on August 8, 2005. Therein, they allege that Wright has failed to make out a claim for deprivation of a liberty interest, intentional infliction of emotional distress, breach of contract, or compelled self-defamation. Defendants seek to incorporate their briefing and arguments on the defamation claim from Wright's Motion for Partial Summary Judgment into their Motion, and assert again that the statements were not defamatory per se and were protected by the defenses of truth and qualified privilege. Wright filed a resistance to this motion on August 31, 2005, and Defendants replied on September 13, 2005.

---

**3.** In this reply, Wright asserts that because Defendants filed a response to his statement of undisputed facts without including a statement of additional material facts, and because some of the statements of fact included in Defendants' brief are not numbered and cited, they fail to comply with the Local Rules and should be stricken from the record. The same statements at issue are properly included within Defendants' Motion for Summary Judgment, so the Court includes these facts in its consideration of the pending motions.

Jurisdiction for the procedural due process claim arises under 28 U.S.C. § 1331, in that the claim itself arises under 42 U.S.C. § 1983.[4] Supplemental jurisdiction for the remaining state common law claims arises under 28 U.S.C. § 1367(a).

## APPLICABLE LAW AND DISCUSSION

### I. Motions for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A summary judgment motion should be utilized by the trial court to dispose of factually unsupported claims and defenses. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Therefore, the trial judge is not to weigh the evidence and determine the truth of the matter but rather to determine whether there is a genuine issue for trial. Id. However, the Court is bound to view the facts in the light most favorable to the nonmoving party and to give that party the benefit of any reasonable factual inferences. E.g., Girten v. McRentals, Inc., 337 F.3d 979, 983 (8th Cir.2003).

While the moving party must initially make a showing of the basis for its motion and the portions of the record that support the party's assertion that there is no issue of material fact, the moving party is not required by Rule 56 to support its motion with affidavits or other similar materials negating the opponent's claim. Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992) (citing Celotex, 477 U.S. at 323, 106 S.Ct. 2548).

When the moving party has carried its initial burden, the nonmoving party must proffer specific facts demonstrating the existence of a genuine issue for trial and may not rely on mere allegations. Vaughn v. Roadway Express, Inc., 164 F.3d 1087, 1089 (8th Cir.1998) (citing Celotex, 477 U.S. at 324, 106 S.Ct. 2548). The nonmoving party must make a satisfactory showing on every element of its case for which it has the burden of proof at trial. Wilson v. Sw. Bell Tel. Co., 55 F.3d 399, 405 (8th Cir.1995); see also Celotex, 477 U.S. at 322, 106 S.Ct. 2548. "[T]o survive the defendant's motion, [the plaintiff] need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." Anderson, 477 U.S. at 257, 106 S.Ct. 2505.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248, 106 S.Ct. 2505. It is thus the task of the trial court to "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." Hartnagel, 953 F.2d at 396 (citing Celotex, 477 U.S. at 322, 106 S.Ct. 2548).

Before the Court are Wright's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment. When cross-motions for summary judg-

---

4. The Complaint lists 28 U.S.C. § 1983, but there is no such code section. Given the nature of the case, it is assumed that Wright meant 42 U.S.C. § 1983.

ment are presented to the Court, the standard summary judgment principles apply with equal force. *New Eng. Reg. Council of Carpenters v. Kinton,* 284 F.3d 9, 19 (1st Cir.2002).

■ Cross-motions for summary judgment do not require the Court to grant summary judgment. "The filing of cross-motions does not concede the absence of a triable issue of fact. The court is bound in such cases to deny both motions if it finds ... there is actually a genuine issue of material fact." *Jacobson v. Md. Cas. Co.,* 336 F.2d 72, 75 (8th Cir.1964). However, such motions do allow the Court "to assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Harrison W. Corp. v. Gulf Oil Co.,* 662 F.2d 690, 692 (10th Cir.1981).

■ When faced with cross-motions, the normal course for the trial court is to "consider each motion separately, drawing inferences against each movant in turn." *EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 603 n. 8 (1st Cir.1995). *See also Buell Cabinet Co. v. Sudduth,* 608 F.2d 431, 433 (10th Cir.1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."). Because of the overlapping nature of the cross-motions, the Court will consider this case by each cause of action in turn, mindful of the separate inferences to be drawn in favor of each movant.

## II. Intentional Infliction of Emotional Distress

Wright claims Defendants' statements and actions regarding the events leading to his termination were willful and intended to inflict severe emotional distress upon him.

■ The elements of a claim of this tort are:

(1) Outrageous conduct by the defendant;

(2) The defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) Plaintiff suffering severe or extreme emotional distress; and

(4) Actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

*Benishek v. Cody,* 441 N.W.2d 399, 402 (Iowa App.1989).

■ Outrageous conduct is that which exceeds "all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized community." *Mills v. Guthrie County Rural Elec. Coop. Ass'n,* 454 N.W.2d 846, 850 (Iowa 1990). Showing sufficiently outrageous conduct is a high hurdle, and "[f]ew cases can be located where an Iowa court actually held the conduct alleged was sufficiently outrageous." *Chester v. Nw. Iowa Youth Emerg. Servs. Ctr.,* 869 F.Supp. 700, 711 (N.D.Iowa 1994).

Iowa courts have found an employer's treatment of an employee rises to the level of outrageous when it entails an extensive campaign of harassment and baseless accusations. *Blong v. Snyder,* 361 N.W.2d 312, 315–17 (Iowa App.1984). However, "yelling" at an employee when firing him for alcoholism is not sufficiently outrageous. *Northrup v. Farmland Indus., Inc.,* 372 N.W.2d 193, 198–99 (Iowa 1985). Neither is seeking criminal charges through proper procedure, *Tomash v. John Deere Industrial Equipment Co.,* 399 N.W.2d 387, 392–93 (Iowa 1987), or accusing an employee of embezzlement, *Benishek,* 441 N.W.2d at 402.

■ Defendants told several people about the bunk bed exchange and the reasons for Wright's termination. As discussed below, these actions may be con-

sidered defamatory. The standard for outrageous conduct is more rigorous, however, and the Court finds Defendants' actions did not meet that standard in this case, even viewing the facts in the light most favorable to Wright. Though what Defendants communicated about Wright was unflattering and upsetting, it is not "outrageous". The parties dispute the characterization of the bunk bed exchange and the circumstances of Wright's discharge, but there is no evidence that Wright's termination was the culmination of a campaign of harassment or baseless accusations, or that Defendants' communication of their version of the situation exceeded all possible bounds of decency. Since the elements of intentional infliction of emotional distress form a conjunctive test and the first element is not met, Wright has failed to state a claim under this theory. Defendants' Motion for Summary Judgment as to Count IV of the Complaint is granted.[5]

## III. Breach of Contract

Wright claims that the personnel polices of KCHC created an employment contract that Defendants breached when they terminated him without proper notice or severance pay. First, the Court must determine whether the employment policy was sufficient to create an employment contract. If so, the Court then must determine if Defendants breached any of the terms of the contract.

██ If an employment contract guarantees an employee that certain terms and conditions will accompany disciplinary actions or termination, an exception to the at-will employment doctrine is created. *Fogel v. Tr. of Iowa Coll.*, 446 N.W.2d 451, 455 (Iowa 1989). An employment policy can create a unilateral contract of employment "when an employer provides a handbook containing disciplinary procedures to a worker, the expressions contained in the handbook (in light of surrounding circumstances) give the worker a reasonable understanding of continued employment, and the employer has reason to know of the worker's understanding." *McBride v. City of Sioux City*, 444 N.W.2d 85, 90 (Iowa 1989).

██ Defendants recite the *Fogel* standard but offer no evidence of how it applies, simply stating that "if the termination policy is viewed in the light most favorable to David Wright as a severance pay policy, [KCHC] takes the position that there was no breach," and Wright barely addresses this argument. Neither party has presented any evidence about how the legal standard relating to transformation of an employment policy into an employ-

---

5. Both parties address the sufficiency of Wright's actual distress. While the intentional infliction of emotional distress claim has been disposed of by Wright's failure to maintain the first element of the tort, the Court notes that there is similarly little evidence that Wright actually suffered actionable emotional distress.

"The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Bethards v. Shivvers, Inc.*, 355 N.W.2d 39, 44 (Iowa 1984). Where the Iowa courts have found severe or extreme distress, it has generally been upon "direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction." *Steckelberg v. Randolph*, 448 N.W.2d 458, 462 (Iowa 1989); *see also id.* at 461–62 (listing examples of cases where the Iowa Supreme Court determined the severity of the emotional distress of plaintiffs asserting this claim). The Court does not doubt that the circumstances giving rise to this case upset Wright greatly and that his life has been adversely affected, but he admits he never saw a doctor or counselor, nor did he take any medication or seek treatment. Therefore, Wright has not presented any evidence that his distress met the high standard for actionable emotional distress.

**948**

ment contract applies in this case, namely whether the intent and communications surrounding the implementation of the personnel policy show that it was considered a contract. It appears the crux of the parties' arguments is whether the circumstances of Wright's discharge constituted a breach of the personnel policy. Because the parties have focused on an issue of interpretation, the Court will assume, *arguendo*, that a contract was created and consider the issue of breach. The relevant provisions of the personnel policy are as follows:

> Termination of Service. Employees resigning after 90 days probationary period are required to present written resignations with a notice period of:
>
> 4 weeks for department head
>
> . . . . .
>
> When employment is to be terminated by the Health Center after 90 days probationary period, an employee will receive 2 weeks notice or 4 weeks notice as mentioned previously. The one exception to this policy would be in case the employment were to be terminated because of gross misconduct by an employee. Reasons for immediate dismissal could be, but are not limited to the following:
>
> 1. Theft of property belonging to a patient, visitor, employee, or the Health Center.
>
> . . . . .

Wright claims this policy entitles him to either four weeks notice of his termination or four weeks of severance pay. Defendants disagree, stating that Wright was terminated for gross misconduct, excepting him from the notice and severance pay terms of the policy. According to Defendants, the gross misconduct was using the KCHC credit card to purchase items that went to his home. Defendants do not specifically state whether the alleged "gross misconduct" falls under the theft

provision or the catch-all ("not limited to") provision of the personnel policy; however, Wolbers said in his deposition that he thought the bunk bed purchase was the equivalent of theft from KCHC.

■ Wright claims he has generated a question of material fact as to whether his actions constituted gross misconduct. Under Iowa law, "interpretation, the meaning of contractual words, is an issue for the court unless it depends on extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." *Allen v. Highway Equip. Co.*, 239 N.W.2d 135, 139 (Iowa 1976).

Under Wright's version of the facts, he claims he cannot have committed gross misconduct because he acted at the direction of Glandon, the individual whom Wolbers authorized to purchase beds, and he had authority to make purchases up to $500 on the KCHC credit card. Wright further asserts that he did not exceed his authority and did not intend to deprive KCHC of any property. However, according to Defendants, Glandon was only given authority to spend $200 on bunk beds, and he denied instructing Wright to make the purchase. The gross misconduct, under Defendants' version of the facts, is that Wright used the KCHC credit card and tax identification number to make a tax-exempt purchase for his own home, and the beds he brought to KCHC were of less value than the new beds he took to his home.

At bottom, the matter now before the Court is not a question of contract interpretation, nor a question of whether the Plaintiff was terminated for gross misconduct; he was. The question is whether the Plaintiff committed acts which constituted gross misconduct, such that the contract protections became unavailable to him. This is a genuine issue of material

fact which precludes summary judgment as to the contract claims in Count V.

## IV. Defamation

The law of defamation includes the torts of libel and slander, "that is, the publication of statements that 'tend to injure a person's reputation and good name.'" *Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74, 83 (Iowa 2001). Wright requests summary judgment on his defamation claim under three theories, each will be addressed in turn.

Wright's complaint alleges separate complaints for libel and slander, although in his following briefs Wright addresses both torts under the general umbrella of defamation. *See Barreca v. Nickolas*, 683 N.W.2d 111, 116 (Iowa 2004) ("defamation is composed of the twin torts of libel and slander"). It further appears that the statements Wright discusses in his briefs are all oral statements. Wright's counsel clarified at oral argument that he is unsure of the publication of any written statements and is proceeding only with slander claims.

### A. Slander per se

At common law, an actionable slander claim generally required proof of actual damage, *id.*, as well as publication of a defamatory statement that was false, malicious, and made of and concerning the plaintiff. *See* Patrick J. McNulty, *The Law of Defamation: A Primer for the Iowa Practitioner*, 44 Drake L.Rev. 639, 643–44 (1996). "However, some statements are defamatory per se; that is, they are of such a nature that the court can presume as a matter of law that their publication will have a defamatory effect, even without a showing by the plaintiff of malice, falsity, or damage." *Kerndt v. Rolling Hills Nat'l Bank*, 558 N.W.2d 410, 418 (Iowa 1997). Statements qualifying as slander per se have been described in four general categories: "imputation of (1) cer-

tain indictable crimes, (2) loathsome disease, (3) incompetence in occupation, and (4) unchastity." *Barreca*, 683 N.W.2d at 116 (citing McNulty, *supra*, at 650–52).

Wright claims the following statements of the Defendants constitute slander per se: he misappropriated KCHC funds, inappropriately used KCHC funds, inappropriately used the KCHC credit card and tax ID number, committed theft and criminal private inurement, and performed his job in an unethical manner. The Iowa Supreme Court has recognized as slander per se statements that a person committed theft and statements that affect a person in his business. *See Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994) (holding "slanderous imputations affecting a person in his or her business, trade, profession, or office are also actionable without proof of actual harm"); *Vinson v. Linn–Mar Comm. Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984) (statement imputing dishonesty to employee was defamatory per se).

Given the differing categories of statements, it will be useful to consider their defamatory nature seriatim.

### 1. Statements That Wright Performed his Job Unethically

 Wright includes this item in his list of defamatory statements made by Defendants. However, as Defendants note, the accompanying record cite is to Wolbers' deposition, in which he states his *opinion* that Wright was not conducting his affairs in an ethical manner. There is no mention there, or anywhere in Wright's brief, that this statement was made to anyone outside of the deposition. While statements considered defamatory per se do not require proof of actual damages, such defamatory statements still must be published. *See Lara*, 512 N.W.2d at 785 ("a plaintiff must prove either that the published statement was slanderous per se

or that the publication caused actual harm to the plaintiff's reputation"). Even if Wolbers' deposition statement was characterized as publication, statements made in judicial proceedings are absolutely privileged. *Spencer v. Spencer*, 479 N.W.2d 293, 295 (Iowa 1991). Accordingly, these statements cannot constitute slander.

### 2. Statements that Wright Committed a Crime or Theft

Defendants emphasize that Wolbers said he never used the word "crime" when discussing the incident. However, he spoke with the Keokuk County Attorney and Ottumwa Police Department about the events of this case. In addition, Wolbers refers in his deposition to "pressing charges," "prosecution," and "pursuing this as a criminal matter." Even viewing the facts in the light most favorable to Defendants, it is clear they contemplated some element of criminality regarding Wright's conduct.

A closer examination of Wolbers' deposition reveals the publication of statements relating to a crime or theft was to the County Attorney, police, and in the course of a hearing before the Unemployment Insurance Appeals Bureau related to this matter. Wright's counsel stated at oral argument that he was no longer pursuing a slander claim based upon what was said to the police or County Attorney.

�as made during the unemployment hearing may be absolutely privileged if the employment hearing is considered a judicial proceeding. As noted above, "Iowa recognizes an absolute privilege (or immunity) for liability for defamation which takes place in a judicial proceeding." *Spencer*, 479 N.W.2d at 295. A judicial proceeding, for purposes of absolute immunity, is "one carried on in a court of justice established or recognized by law, wherein the rights of parties which are recognized and protected by law are involved and may be determined." *Mills v. Denny*, 245 Iowa 584, 63 N.W.2d 222, 226 (Iowa 1954). The Iowa Supreme Court has previously determined that a workers' compensation proceeding is a "judicial proceeding" for purposes of the privilege, considering such proceeding "a tribunal in which the rights of injured employees are recognized and protected." *Tallman v. Hanssen*, 427 N.W.2d 868, 869–70 (Iowa 1988).

Workers' compensation and unemployment appeals hearings are both conducted pursuant to the Iowa Administrative Procedure Act, Iowa Code § 17A (2005). *See* Iowa Code § 96.6(3) (2005) (providing for appeal of unemployment benefits decisions to an administrative law judge; hearings to be conducted pursuant to chapter 17A); Iowa Code § 86.17 (providing for hearings on contested workers' compensation cases, to be presided over by workers' compensation commissioner or deputy pursuant to chapter 17A). In addition, both types of hearings involve fact finding and dispute resolution and are thus "confrontational and judicial in nature." *Tallman*, 427 N.W.2d at 870. Accordingly, the Court finds the rationale of *Tallman* applicable to the unemployment insurance appeal in the present case.[6] Absolute immunity

---

6. Absolute immunity is designed to "encourage the open resolution of disputes by removing the cloud of later suits from statements made in judicial proceedings." *Tallman*, 427 N.W.2d at 870; *see also Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F.Supp.2d 909 (E.D.Va.2004) (applying privilege to proceedings before District of Colombia Office of Unemployment Compensation); 53 C.J.S. *Libel and Slander* § 119 (2005) ("the term 'judicial proceeding' normally is employed in a flexible fashion to embrace any governmental proceeding involving the exercise of a judicial or quasi-judicial function, including a wide variety of administrative boards, commissions, or other tribunals which may engage in judicial or quasi-judicial action, even though not part of the court system.").

therefore applies, and none of these statements can provide the basis for a slander claim.

### 3. Statements of Improper use of KCHC Funds

■■■ The statements that Wright misappropriated KCHC funds, inappropriately used KCHC funds, inappropriately used the KCHC credit card, and inappropriately used the tax ID number are sufficiently similar that they will be considered together.

Wright asserts that these statements are defamatory per se, in that they negatively affect him in his business or profession. As discussed above, that category of statements is recognized in Iowa as defamation per se. *See Lara*, 512 N.W.2d at 785–86; *Vinson*, 360 N.W.2d at 115–16.[7]

In *Lara*, an employee brought suit against her former employer alleging, inter alia, that the employer had defamed her to a co-worker and new employer. *Lara*, 512 N.W.2d at 785–86. The former employer asked a co-worker if the employee had a substance abuse problem; and, after the employee had secured a different job, the former employer called the new employer and stated the employee was unreliable. *Id.* The Iowa Supreme Court found the former employer's statements could be construed as slander per se because they reflected on the employee's capacity or fitness to perform her job and upon her character as an employee. *Id.* The court noted the former employer was not responding to an inquiry from the new employer but rather had made a special effort, unprovoked, to contact the new employer. *Id.* at 786.

In *Vinson*, a school bus driver and her supervisor disagreed over the method of reporting her time cards. *Vinson*, 360 N.W.2d at 112–14. The driver was terminated and sought work at a neighboring school district. *Id.* at 114. When the school district called the driver's former supervisor, he told them she was terminated for recording incorrect time on her time cards. *Id.* The Iowa Supreme Court found that the statement was defamatory per se, holding that "[a]n attack on the integrity and moral character of a party is libelous per se. [Therefore] it is libel per se to make a published statement accusing a person of being a liar. We find no meaningful distinction between accusing a person of being a liar and accusing a person of falsifying information." *Id.* at 116 (internal citations omitted).

The statements in the present case were not communicated by Defendants to Wright's potential or actual future employers. However, to whom the statements were made is relevant to the privilege inquiry, below, as it is the nature of the statements themselves that guides the analysis of defamation per se. *See id.* ("Words are libelous per se *if they are of such a nature* . . . that the court can presume as a matter of law that their publication will have libelous effect.") (emphasis added). Statements that an employee misused company funds, credit cards, or tax identification numbers reflect on the integrity, trustworthiness, and fitness of an employee for his job duties, particularly when the employee's job duties involve responsibility over the employer's finances, as did Wright's duties as CFO. Therefore, the Court finds the statements concerning Wright's alleged misuse of the KCHC

---

**7.** The Court is aware that the practical effect of these statements may also be to impute criminal behavior to Wright, which presents additional grounds for finding the statements slanderous per se. Wright did not present his argument as to imputation of criminality under this rubric, however, and the Court finds the statements slanderous per se because of their effect on Wright in his business or profession.

credit card, funds, and tax identification number are slander per se.

The statements that Wright committed a crime and performed his job unethically are not slander per se and provide no basis for a slander claim because they lack the element of publication to a non-privileged party. The remaining statements regarding misuse of KCHC funds are slander per se, so the only issues remaining on the defamation claim are whether the statements were protected by privilege, and, if so, whether the privilege was abused and whether any additional affirmative defenses apply.

## B. Qualified Privilege

Defendants assert that a qualified privilege applies to statements made to the Directors Council, Wright's direct reports, Sonya Wehr, Stephene Wright, Mike Trachta, Lisa Bennett, and Lynn Olson. "[T]he law recognizes that circumstances may arise when a person, in order to protect his or her own interest or the interest of others, must make statements about another which are defamatory or defamatory per se, and in such circumstances a qualified privilege bars liability." *Lyons v. Midwest Glazing, L.L.C.*, 235 F.Supp.2d 1030, 1046 (N.D.Iowa 2002); *see also Barreca*, 683 N.W.2d at 117.

Traditionally, the elements of a qualified privilege defense are (1) the statements were made in good faith, (2) the defendant had an interest to uphold, (3) the scope of the statement was limited to that interest, and (4) the statement's publication was on a proper occasion, in a proper manner, and to proper parties only. *See Thompto v. Coborn's, Inc.*, 871 F.Supp. 1097, 1126 (N.D.Iowa 1994); *Barreca*, 683 N.W.2d at 118.

In *Barreca*, however, the Iowa Supreme Court noted that although both parties framed the qualified privilege issue in terms of the factors test, "we do not...."

Our task is simply to determine whether the occasion of [the] statement was qualifiedly privileged; if the occasion was so privileged, it must then be determined whether that privilege was abused." *Barreca*, 683 N.W.2d at 118 (finding that a city council member enjoyed a qualified privilege for statements made in the performance of his official duties). Since *Barreca*, the Iowa Court of Appeals has held "the court's task now is simply to determine whether the occasion of the statement was qualifiedly privileged." *Olson v. Ballantine*, 695 N.W.2d 43, 2004 WL 2578958, at *3 (Iowa App.2004) (finding statements made by county employees to the county Board of Supervisors were covered by a qualified privilege).

In *Park v. Hill*, the district court stated that while it had previously applied the factors test, *Barreca* required application of the occasional privilege test. *Park v. Hill*, 380 F.Supp.2d 1002, 1018 (N.D.Iowa 2005). The court in that case held a qualified privilege applied to the statements of the defendant, an unsuccessful tender offeror, who wrote a letter to the shareholders accusing the president of the bank of impropriety in handling his offer. *Id.* at 1023. The court noted the Iowa Supreme Court's reliance on the Restatement (Second) of Torts in *Barreca* provided guidance for determining what occasions give rise to a qualified privilege. *Id.* at 1019–20.

Under the Restatement, the occasions that give rise to a qualified privilege removing liability for defamation are determined by a list of factors including protection of the publisher's interest, protection of the interest of the recipient or third party, common interest, family relationships, and communication to those who may act in the public interest. Restatement (Second) of Torts §§ 594–598A.

▆ Despite the expansion of the standards used to determine the existence of the privilege, the Iowa courts agree that the applicability of a qualified privilege is normally a question of law for the court to decide, *Barreca*, 683 N.W.2d at 118, with the defendant bearing the burden to establish the existence of the privilege. *Thompto*, 871 F.Supp. at 1126. The privilege does not extend to statements made to the general public but can extend to statements that are untrue, provided there is no actual malice. *Id*. The privilege can also be abused, and thereby lost, if the defendant acts with actual malice, publishes the statement excessively, or publishes the statement to persons not having a legitimate interest in the subject. *Theisen*, 636 N.W.2d at 84. An abuse of privilege is generally a question of fact for the jury. *Barreca*, 683 N.W.2d at 118.

### 1. Directors Council

▆ The Directors Council consisted of Wright, Dan Glandon, Director of Ambulance Services, Bill Haloran, Director of Facility Services, and Jerlyn Bowers, Director of Patient Care Services. Wright's brief claims the Directors Council members were his subordinates, but his own deposition testimony states they were considered equals. Wright testified that as part of his normal duties he met with the Directors Council members regarding budgeting needs for their respective departments. Also, under the spending policy, it appears Wright would have approved any spending by the Directors Council in the $100 to $500 range. Wolbers testified in his deposition that the Directors Council members were not involved in any decision-making process regarding Wright's suspension or termination.

Wolbers called two meetings with the Directors Council—one to say that Wright was suspended until further notice, and one to say that Wright had been terminated. Wolbers asserts he did not mention the misuse of the credit card or funds in the first meeting and waited until after Wright had been terminated to explain the situation, though some evidence in the record indicates the bunk bed exchange or credit card use may have been discussed at the first meeting. It is also unclear from the record to what extent or detail the reasons for Wright's termination were discussed with the Directors Council.

Defendants assert that these communications are privileged because Defendants and the Directors Council shared a common interest and the communication was made on an appropriate occasion. The Court is persuaded that the nature of Wright's work with the Directors Council and the Council's management-level status indicate that this is the type of body to which communication would generally be privileged. It is reasonable to assume the Directors would need to know at least some information to go about budgeting and procuring for their departments to further their common interest in running the hospital. However, factual questions remain regarding the content and occasion of these statements. Although Defendants may eventually be able to demonstrate the appropriateness of the occasion and scope of the communication, the record is presently insufficient to permit the Court to find application of a qualified privilege as a matter of law.

### 2. Personnel Directly Reporting to Wright

Similar uncertainty attends the communication to Wright's direct reports. As with the Directors Council, apparently the Defendants held one meeting regarding Wright's suspension and one meeting regarding his termination. The nature and extent of the communications made on each occasion is also similarly unclear, but

at one point Wright's direct reports were told the reasons for his dismissal.

Wright supervised the staff, but they did not have any involvement in or authority over the decision to terminate Wright. He argues, therefore, that the communication was not made on a proper occasion and exceeded the scope of what was necessary to further their interest in running the hospital. Defendants claim they provided the staff with necessary information to allow them to carry on their duties in Wright's absence, and, specifically, that because the staff handled financial and bookkeeping matters, they needed to know about appropriate use of the credit card.

Defendants rely upon *Wirig v. Kinney Shoe Corp.* in urging the Court that a qualified privilege is applicable as a matter of law. In *Wirig*, the court found the employer had used a proper occasion and purpose when it published an allegation of theft against an employee at a meeting of management and subordinates. *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 379–80 (Minn.1990). Although the employee in *Wirig* was a subordinate, the allegations concerned a pattern of theft from a retail shoe store that management determined had been committed by several employees, including the plaintiff. *Id.* The court determined that the common interest in operating a successful, theft-free store provided a qualified privilege. *Id.* The theft in *Wirig* was merchandise loss in a retail sales facility, which any sales associate would presumably have access to commit; indeed, the court noted the purpose of the publication was to protect the employer from future losses by making its position clear and punishing those responsible. *Id.* Wright's direct reports are not in a position similar to the employees at the meeting in *Wirig.* Only the CEO and CFO had hospital credit cards, and the record does not show anyone but Sonya Wehr responsible for accounts payable. Defendants have not shown that disclosure to Wright's direct reports would protect them from misuse of the credit card because they have not shown any of these employees was ever in a position to use or misuse the credit card.

The Court agrees with Defendants that some disclosure may have been necessary given that these employees reported directly to Wright and execution of their duties required interaction with Wright in his supervisory capacity. However, the Court finds the record in this case reveals material questions of fact regarding the content of the communications made at each meeting, and thus the Court is unable to determine the appropriateness of the occasion and the content of the communications as relates to the shared interest of the parties. The record is insufficient to demonstrate as a matter of law that the communications to Wright's direct reports are protected by a qualified privilege. Fact issues remain for the jury.

### 3. Sonya Wehr

■ Wehr was responsible for accounts payable and human resources at KCHC, although she had no responsibility for employee termination, discipline, or investigation. She was also a party to the meetings of Wright's direct reports discussed above.

Wolbers contacted Wehr to determine if she had received a receipt for the bunk bed purchase and if she had been given any information about that purchase. Wolbers also asked her about the language of the personnel policies and their application to Wright's situation. It was part of Wehr's duties to collect receipts and match them with the bills that came into KCHC and also to maintain the personnel policies. Given how her responsibilities related both to human resources and to the processing of the credit card exchange, discussing the

situation with her was a reasonable and necessary part of Defendants' investigation of the bunk bed exchange.

It appears that Wolbers' conversation with Wehr occurred over the telephone, and other than a bald assertion that the statement was not made on an appropriate occasion or in an appropriate manner, Wright has not offered any evidence that the conversation was not private or discreet. The communication with Wehr was made in furtherance of a common interest in investigating employee misconduct and running a successful hospital. It was made on a proper occasion and within an appropriate scope. Accordingly, the Court finds no issue of material fact precluding application of a qualified privilege.

### 4. Stephene Wright

■ The situation of Ms. Wright is complicated by the fact that she was Wright's spouse and also a KCHC employee. Wolbers spoke with Ms. Wright in connection with his investigation, telling her that Wright had misused the credit card and asking her what she knew about the transaction. This conversation apparently occurred in Wolbers' office, and there is no evidence that anyone else was present. Wolbers also followed up his conversation with a letter to Ms. Wright, offering his condolences during what was a difficult time for her family and directing her to optional employer-sponsored counseling resources.

Defendants assert confronting Ms. Wright was proper because she was married to Wright at the time, so the bunk bed exchange involved moving beds to and from her home. Wolbers claims he was entitled to discuss the matter in full with Ms. Wright to determine the extent of her involvement and whether disciplinary action was warranted. Wright claims because Wolbers told Ms. Wright that her husband had misused the credit card, Wol-

bers had already determined Wright's guilt and the conversation could therefore no longer be characterized as part of any investigation. The Court finds this argument unpersuasive. To the extent any such statements were made, Wright has not shown they reflect anything but investigatory style on the part of Wolbers.

Wolbers interviewed Ms. Wright privately, about a matter concerning the hospital in which he thought she was potentially involved. This communication was made to a party with a legitimate interest, within the scope of that interest, and on a proper occasion. The Court finds no issue of material fact in this regard. A qualified privilege applies to the statements made to Ms. Wright.

### 5. Mike Trachta

■ Trachta was CEO of KCHC before Wolbers, and apparently his departure prompted Wright's term as interim CEO. Wolbers contacted Trachta regarding a budgeting question after Wright was terminated. When Trachta asked why Wright was not handling the budget, Wolbers told him about the bunk bed exchange and Wright's subsequent termination. Defendants claim Trachta had a shared interest because he formerly held Wolbers' position and worked with Wright, so he would know if similar issues about Wright had come up in the past. Wright argues the communication was not limited in scope and Trachta was not a proper party for disclosure. At best, Wright claims, Trachta should simply have been told that Wright was no longer with KCHC.

Wright had already been terminated when this communication occurred, so it is difficult to ascertain why Wolbers had an interest in determining whether Trachta had similar issues with Wright. If the purpose of the call was, as Wolbers claims, to receive assistance on a budgeting issue,

Defendants have not adequately explained why it was necessary for Wolbers to detail the bunk bed transaction and therefore have failed to meet their burden to show that the communication to Trachta was made on an appropriate occasion. Accordingly, the Court finds no genuine issue of material fact as to this communication, and a qualified privilege is inapplicable as a matter of law.

#### 6. Lisa Bennett

Bennett was the CFO of Marengo Memorial Hospital and was not affiliated with KCHC at the time of Wright's termination. KCHC's auditor suggested that Wolbers hire Bennett to assist him until a new CFO could be hired. Defendants informed Bennett that Wright had improperly used the KCHC credit card.

Wright asserts that Bennett should have been told only that Wright was no longer with KCHC. Defendants assert that Bennett was going to be going through the books and records of KCHC and therefore had a shared interest in the finances of KCHC. Further, Defendants claim Bennett needed to be apprised of the situation so she could identify any similar activity. There is no evidence that these statements were made in anything other than a private manner. While some disclosure may have been warranted if she was reviewing KCHC's finances for discrepancies, it is also unclear why these duties could not have been handled by KCHC's auditors. Attempts by the Court at oral argument to clarify exactly what duties Bennett performed yielded little information. Accordingly, the Court finds that material issues of fact remain as to the nature of Bennett's duties and, correspondingly, whether the manner and occasion of the communication were proper. Therefore, the Court is unable to determine as a matter of law that a qualified privilege applies to these statements.

#### 7. Lynn Olson

Olson was Wolbers' former boss and mentor and the CEO of Ottumwa Regional Health Center. Wolbers contacted Olson around the time Wright was suspended. He explained the bunk bed exchange and credit card use in the course of seeking advice about his decision to suspend and possibly terminate Wright.

Wolbers was seeking guidance in the proper performance of his duties, and, as such, a potential assertion of protection of a legitimate interest exists. However, it also appears from the record that Olson did not provide any advice to Wolbers or have any involvement in the decision to terminate Wright and had no authority to be involved in KCHC employment decisions. The Defendants have not demonstrated why such detailed disclosure deserves a qualified privilege when it was made to someone outside the company with no involvement in the underlying decision. The Court finds as a matter of law that no privilege attaches to the statements to Olson.[8]

8. Having determined the applicability of a qualified privilege to all statements at the summary judgment stage, the Court notes that both parties have raised the issue of actual malice. The Defendants do so in their resistance, stating that they conducted a bona fide investigation, so actual malice is not present here. *See Vojak v. Jensen,* 161 N.W.2d 100, 107 (Iowa 1968) *abrogated by Barreca,* 683 N.W.2d 111 (finding lack of bona fide investigation warranted submission of actual malice to jury, applying pre-*Barreca* definition of actual malice). Wright asserts that the actual malice standard is inapplicable because the statements at issue are defamatory per se; however, that does not dispose of the actual malice issue.

Having determined that the statements about Wright's use of the credit card and tax identification number are defamatory per se, he is correct that he is no longer required to establish actual malice as part of his prima facie case. *Schlegel v. Ottumwa Courier,* 585

## C. Defense of Truth

The Defendants claim the defense of truth applies to their statements about Wright, namely that he improperly used the credit card and tax identification number and inappropriately used or misappropriated KCHC funds.[9] Substantial truth is a complete defense to a defamation action. *Behr v. Meredith Corp.*, 414 N.W.2d 339, 342 (Iowa 1987). A defendant is not required to establish the truth of every detail as long as the "gist" of the statement is true. *Id.* "If the underlying facts as to the gist or sting of the defamatory charge are undisputed, the court may determine substantial truth as a matter of law." *Id.; see also Wilson v. IBP, Inc.*, 558 N.W.2d 132, 140–41 (Iowa 1996).

According to the Defendants, their statements were substantially true. While Wright did have the authority to make purchases up to $500 on the KCHC credit card, Defendants argue Wright's authority did not extend to making purchases for his personal use. They further argue the authority for the bunk bed transaction was established by Wolbers and consisted of allowing Glandon to purchase beds for $100 to $200, which did not happen. Because Wright took the beds to his home and used the KCHC tax exemption for the purchase, the Defendants argue their statements that this was an inappropriate transaction were substantially true and therefore a complete defense to the defamation charge.

Wright argues that the statements are false. While the Defendants focus much of their argument on the authorization for the transaction, Wright argues that since Glandon had authority to purchase beds and he was directed by Glandon to make the purchase, then Glandon effectively delegated his authority to Wright. Wright further denies there was anything improper about the transaction.

Here, several facts underlying the truth of the statements are disputed. First, the parties dispute whether the authority to purchase the bunk beds was for a maximum of $200 or $800. Second, the parties dispute whether this transaction was at the direction of Glandon or whether Wright played a role beyond following his instructions. When facts underlying the gist of the allegedly defamatory statement are disputed, it is not proper for the Court to determine truth as a matter of law. *Behr*, 414 N.W.2d at 342. Accordingly, Defendants' Motion for Summary Judgment on the issue of truthfulness is denied.

## V. Compelled Self–Defamation

The injury redressed by a defamation claim is the injury caused to the reputation of the plaintiff by someone other than the plaintiff. *Theisen*, 636 N.W.2d at 83. Generally, "an injured party cannot create a defamation action by repeating the statement originally made only to him," but the Iowa Supreme Court has recognized an exception when an party is under strong compulsion to republish defamatory statements about himself. *Id.* (citing *Belcher v. Little*, 315 N.W.2d 734, 737 (Iowa 1982)).

N.W.2d 217, 222 (Iowa 1998). However, a showing of actual malice is also one way to demonstrate abuse of a qualified privilege. *Barreca*, 683 N.W.2d at 118 (adopting the actual malice standard as defined in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Because both parties misstate the application of the actual malice standard to the present case, the record provides no basis upon which the Court can consider actual malice as pertains to abuse of a qualified privilege at this time.

9. As noted above, the statements regarding ethics, theft, and crime were not published outside of comments to law enforcement personnel and in the course of a judicial proceeding, so those statements dropped out of the defamation analysis and are not analyzed here.

The finder of fact determines whether such compulsion exists under the circumstances of each case, based upon the introduction of substantial evidence. *Belcher,* 315 N.W.2d at 738.

The crux of a compelled self-defamation claim is whether the speaker can reasonably foresee that the person about whom they are speaking will be compelled to repeat the statement to a third party. *Theisen,* 636 N.W.2d at 83. The Iowa Supreme Court has found "[s]uch foreseeability is especially apparent in employment situations because an employee will ordinarily seek new employment after being terminated for alleged wrongdoing." *Id.* When asked by prospective employers to explain why he left KCHC, Wright could tell them about the bunk bed exchange and credit card use, or he could create an alternative story. "Fabrication, however, is an unacceptable alternative." *Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 888 (Minn.1986).

■ The Northern District of Iowa concluded that if the speaker had a qualified privilege to make the statements, that privilege should extend to protect the subject's self-publication of those statements. *Thompto,* 871 F.Supp. at 1128. The Iowa Supreme Court agreed, stating that "qualified immunity applies when the person publishing the statement is the party injured by the statement rather than the party who originally made the statement." *Theisen,* 636 N.W.2d at 84. The court took this notion one step further, holding that "we ... recognize and adopt a qualified privilege for statements made by employers to employees concerning the reasons for an employee's discharge regardless of whether the employer or employee publishes the statement." *Id.* at 85. The court said to hold otherwise would allow every termination decision to automatically become a defamation case and further recognized that it is in

the public interest for information about terminations to be available to the employee and his prospective employers. *Id.*

Neither party cited the *Theisen* case in their briefs or mentioned application of a qualified privilege; consequently, most of their arguments concern whether Wright was under a strong compulsion to disclose the statements to potential employers. However, despite the strategic posture of the parties, the Court must follow established law; thus, in light of *Theisen,* the statements made by Wright to two potential employers are qualifiedly privileged.

■ The only issue remaining on this claim is whether Wright can demonstrate loss of the privilege through abuse by KCHC (such as through actual malice or excessive publication). Though the parties did not address this issue, the standard for abuse of a qualified privilege is the same under a direct defamation claim, which has already been addressed above, *supra* Part IV.B. As the Court previously noted, abuse of a qualified privilege is generally a question of fact to be determined by the jury. *Barreca,* 683 N.W.2d at 118. Accordingly, Defendants' Motion for Summary Judgment on the compelled self-defamation claim in Count VI is denied.

## VI. Due Process

Wright asks this Court to grant him summary judgment on his claim that Defendants violated his right to procedural due process under the Fourteenth Amendment by failing to provide him with a pretermination hearing. This issue can be broken down into two inquiries: whether Wright was entitled to a hearing, and if so, whether adequate process was provided.

### A. Entitlement to Hearing—Implication of a Liberty or Property Interest

The Due Process Clause of the 14th Amendment provides that "[n]o State shall

... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Eighth Circuit has held "[p]rocedural due process claims require a two-step analysis. Initially, a plaintiff must demonstrate that the state deprived him of some 'life, liberty, or property' interest. If successful, the plaintiff must then establish that the state deprived him of that interest without sufficient 'process.'" *Krentz v. Robertson,* 228 F.3d 897, 902 (8th Cir.2000). The state or government actor in this case is KCHC, because it is a county hospital organized as such under Iowa law. Neither party disputes this.

 Wright's brief asserts that he had both a liberty and a property interest in continued employment with KCHC, although the Complaint asserts only a liberty interest.[10] A liberty interest is implicated where the terms of the dismissal involve charges of a damaging character that would jeopardize a person's reputation because such charges can create a near-inescapable stigma, depriving the employee of future employment opportunities. *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 573–74, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Winegar v. Des Moines Indep. Comm. Sch. Dist.,* 20 F.3d 895 (8th Cir.1994). A property interest is not constitutionally created but depends on an outside source such as state law or contract between the parties. *Id.* at 899.

### 1. Liberty Interest

To establish a claim for deprivation of due process based on infringement of a liberty interest, Wright must establish that the reason for his discharge stigmatized him, the Defendants made those reasons public, and he denied the charges. *Coleman v. Reed,* 147 F.3d 751, 755 (8th Cir.

1998). Wright asserts he was stigmatized because Defendants' statements damaged his reputation, honor, and good name. "The requisite stigma has generally been found when an employer has accused an employee of dishonesty, immorality, criminality, racism, and the like." *Winegar,* 20 F.3d at 899.

In *Winegar,* the Eighth Circuit found that allegations of child abuse implicated the liberty interest of the plaintiff teacher. *Id.* In *Shands v. City of Kennett,* 993 F.2d 1337 (8th Cir.1993), the Circuit found a city official's statements to the press that the plaintiff was discharged for insubordination and misconduct "did not create the level of stigma required to implicate a constitutionally protected liberty interest." *Id.* at 1347; *see also Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (where at-will public employee is discharged and the reasons are communicated only to the employee and in litigation documents, no liberty interest is implicated); *Wellner v. Minn. State Jr. Coll. Bd.,* 487 F.2d 153 (8th Cir.1973) (termination based on allegations of racism required hearing); *Hostrop v. Bd. of Jr. Coll. Dist. No. 515,* 471 F.2d 488, 494 (7th Cir. 1972) (plaintiff entitled to hearing where dismissal involved allegations of misrepresentation, supplying false information, and withholding information).

 The facts of this case fall somewhere between *Winegar* and *Shands.* While allegations of inappropriate use of a credit card and tax identification number are not as serious as allegations of physically abusing a child, the allegations leveled against Wright relate as uniquely to his duties in finance and accounting as allegations of abusing children relate specially to the job of a teacher. Overall, the

---

**10.** Based upon comments at oral argument, the Court assumes the Complaint has been amended to include a property interest.

allegations against Wright are similar to the "insubordination" and "misconduct" alleged in *Shands*, but the statements included here were far more detailed and were published to several people, increasing the potential that the statements would be repeated and stigmatize Wright in the community. Although the Defendants dispute that they made the allegations public, their argument appears to rest upon the fact that no one from KCHC contacted the press and that any other communications were protected by a qualified privilege. As discussed above, some of the comments fall outside the realm of qualified privilege, and contact with the press is not required to make the allegations public. *See Winegar*, 20 F.3d at 899 (holding that a school district's communications to students and an outside investigator were sufficiently public).

Finally, Wright denied that was anything wrong or improper about the bunk bed exchange during the meeting with Wolbers regarding his suspension and has continued to do so. In light of the above discussion, the Court finds the circumstances of Wright's termination implicated a liberty interest, entitling him to a hearing.

### 2. Property Interest

The key case involving a property interest in employment is *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), though the Eighth Circuit has found that "the due process requirements pronounced in *Loudermill* apply equally to liberty and property interests." *Coleman*, 147 F.3d at 755.

In *Loudermill*, the plaintiff was hired as a security guard, which was a classified civil service position under Ohio law, meaning that he could be terminated only for cause. *Id.* at 535, 105 S.Ct. 1487. The plaintiff was dismissed when the employer discovered that he had been convicted of a felony, though he had indicated otherwise on his job application. *Id.* The dismissal was via letter, and plaintiff had no opportunity to respond. *Id.* The Supreme Court held that the Ohio statute created a property interest in employment because it allowed termination only for specific reasons. *Id.* at 538–39, 105 S.Ct. 1487. This property interest entitled the plaintiff to a hearing prior to his termination. *Id.* at 542, 105 S.Ct. 1487.

Wright asserts that he is a "tenured public employee" by virtue of the KCHC employment policies, which he claims create a property interest in his employment because they require employees to provide a certain amount of notice before resigning and obligate KCHC to provide notice before terminating an employee unless the termination is for gross misconduct.

■ Defendants assert that KCHC policies did not obligate them to give Wright notice of his termination because he *was* terminated for gross misconduct. Further, Defendants presented a copy of the employment application, signed by Wright, specifically stating that his employment was at will and terminable by either himself or KCHC without cause. Further, Defendants assert that no provision in the Iowa Code governing county hospitals (chapter 347) gives rise to a property interest to continued employment, unlike, for example, the protections afforded public school teachers under Iowa Code chapter 279.

Viewing the facts in the light most favorable to Defendants, Wright has not shown that the terms of his employment created a property interest. As noted in the Court's discussion of the breach of contract claim above, issues of material fact remain as to the application of the employment policy to the circumstances of Wright's discharge. Further, because the

Court has already determined that a liberty interest is implicated in this case, Wright has shown that he was entitled to a hearing. *See Coleman,* 147 F.3d at 755 ("the due process requirements pronounced in *Loudermill* apply equally to liberty and property interests").

### B. Sufficiency of Hearing

The Defendants claim that if Wright was entitled to a hearing, he received one because Wolbers and Latcham met with Wright before he was terminated and allowed him to address the Board of Directors in closed session after his termination. Wright challenges the adequacy of the process he was provided by pointing to a statement in Wolbers' deposition where he admits no pre-termination hearing was conducted and further states that the hearing did not provide a meaningful opportunity to be heard and was not before an impartial tribunal.

■ The essential requirements of due process are notice and an opportunity to respond, whether in person or in writing. *Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487. The hearing need not be elaborate. *Id.* at 545, 105 S.Ct. 1487. In *Coleman,* the Circuit explained the type of pre-termination hearing contemplated by *Loudermill* was "intended to serve as 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Coleman,* 147 F.3d at 754 (quoting *Loudermill,* 470 U.S. at 545, 105 S.Ct. 1487). The *Coleman* court found no delay between the "notice" and "opportunity to respond" is constitutionally required, and a face-to-face meeting confronting the employee with the charges is satisfactory.

■ *Krentz v. Robertson,* 228 F.3d 897 (8th Cir.2000), emphasized the distinction between the adequacy of pre-termination and post-termination hearings, noting that pre-termination hearings can be limited, especially if post-termination proceedings are available and extensive. *Id.* at 902–03. The pre-termination hearing in this case was the meeting between Wolbers, Wright, and Latcham. Although Wolbers said in his deposition that no pre-termination hearing was conducted, the fact that the minimal standards for pre-termination hearings do not comport with a lay definition of the term "hearing" is not dispositive. The meeting served the purposes of a pre-termination hearing required by law: Wright was given notice of the charges against him, told the substance of the charges, and had an opportunity to deny the charges in a face-to-face meeting.

Wright also challenges the sufficiency of the post-termination proceedings because he claims his presentation before the Board of Directors on January 30, 2003, lacked a fair and impartial decisionmaker. *Id.* at 905 (stating that "[t]he right to a fair and impartial decisionmaker forms an essential part of the protection afforded by the Due Process Clause" in discussing the adequacy of post-termination proceedings).

Defendants argue that the hearing provided adequate process because Wright and Glandon were allowed to present orally to the Board, and Wright distributed a prepared written statement. Wright states the meeting in front of the Board of Directors was insufficient because it was only twelve minutes long, and the Board was in closed session, so it was not public and he did not have an opportunity to present adequate evidence.

Wright was given the opportunity to address the ultimate decisionmaker, and he had significant control over the nature of that communication: the minutes of the meeting indicate it was Wright himself who requested the closed session, and he prepared and distributed a written state-

ment. Wright has failed to address why his prepared statement did not include any evidence he wanted to present before the Board and has similarly failed to present evidence that the Board of Directors was not impartial or did anything other than fill its essential role as a check on management. *See Hortonville Joint Sch. Dist. v. Hortonville Educ. Ass'n.*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976) (holding that the school board was impartial enough to provide an adequate termination hearing for group of public school teachers). Therefore, in terms of his summary judgment motion, Wright has failed to present evidence beyond mere allegations establishing constitutionally deficient process. Even viewing the facts in the light most favorable to Wright for purposes of Defendants' motion, Wright's process was adequate.

Therefore, the Court finds that Wright has established the existence of a liberty interest, but a fact question remains regarding the existence of a property interest. However, even assuming, *arguendo* that such an interest exists, Wright was provided with constitutionally adequate pre-termination and post-termination process. Therefore, Wright's Motion for Summary Judgment on his claim of violation of procedural due process is denied, and Defendants' motion is granted.

## CONCLUSION

Wright has failed to show sufficiently outrageous conduct to sustain his intentional infliction of emotional distress claim, and the Defendants' Motion for Summary Judgment is granted as to this claim in Count IV.

The determination of the breach of contract claim will depend on whether Wright was in fact terminated for gross misconduct. This is a question of fact that is properly left to the jury, and Defendants'

Motion for Summary Judgment is denied as to this claim.

Under the defamation claim, the statements about Wright's misuse of the credit card are defamatory per se. A qualified privilege attaches to the statements made to Wehr and Stephene Wright; no privilege attaches to statements made to Trachta and Olson; and questions of material fact remain regarding the application of a qualified privilege to the statements to the Directors Council, Wright's direct reports, and Bennett. Where the Court has found a qualified privilege does apply, the issue of abuse of that privilege is properly left to the jury. The record demonstrates a genuine issue of material fact as to the defense of truth. Therefore, both motions for summary judgment on the defamation claims are granted in part and denied in part.

The compelled self-defamation claim presents similar questions of fact regarding abuse of the qualified privilege, and thus Defendants' Motion for Summary Judgment on this claim is denied.

Under the procedural due process claim, the circumstances of Wright's termination implicated a liberty interest and entitled him to a hearing. He has raised issues of material fact regarding the existence of a property interest, but even assuming the existence of that interest, the process provided by Defendants was constitutionally adequate to safeguard either the liberty or property interest, so Defendants' Motion for Summary Judgment on this claim must be granted.

Plaintiff's Motion for Partial Summary Judgment (Clerk's No. 7) must be granted in part and denied in part as set forth above. Also as detailed above, Defendants' Motion for Summary Judgment

(Clerk's No. 21) must be granted in part and denied in part.

**IT IS SO ORDERED.**