993 F.2d 1337
 Mitchell SHANDS, Don Key, Forrest Busch, Appellants,
v.
CITY OF KENNETT, Warren Karsten, John Mallott, Jerry Talley,
John Vardell, Jingo Cole, individually and in
their official capacities, Appellees.
Mitchell SHANDS, Don Key, Forrest Busch, Appellees,
v.
CITY OF KENNETT, Warren Karsten, John Mallott, Jerry Talley,
John Vardell, Jingo Cole, individually and in
their official capacities, Appellants.
 Nos. 92-1790, 92-1978.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 16, 1992.
Decided May 21, 1993.
Rehearing and Rehearing En Banc Denied July 9, 1993.
 
 Jim Bruce, Kennett, MO, argued for appellants.
 Terry M. McVey of Kennett, argued (Mark J. Pelts, on brief), for appellees.
 Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and BATTEY,* District Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 Forrest Busch, Don Key, and Mitchell Shands brought this action under 42 U.S.C. § 1983 against the City of Kennett, Missouri, and several city officials: Mayor Warren Karsten, Fire Chief John Mallott, and City Councilmen Jerry Talley, John Vardell, and Jingo Cole. Plaintiffs appeal from a judgment notwithstanding the verdict entered by the district court in favor of defendants. 789 F.Supp. 989. Defendants cross-appeal from the district court's denial of their motion for a new trial. We affirm the judgment notwithstanding the verdict and therefore do not address the cross-appeal.
 
 I.
 
 2
 The City of Kennett, having a population of approximately 12,000, operates a volunteer fire department. At the time of the events giving rise to this lawsuit, the department was staffed by seven full-time firemen and twenty-four volunteers. It was the dismissal of plaintiffs from their positions as part-time volunteer firemen that triggered this lawsuit.
 
 
 3
 In 1988, the fire department had three officers, all volunteers: Fire Chief Bill McMahon, Assistant Fire Chief Don Key, and Captain Bob Holder. In the fall of 1988, the Kennett City Council decided to replace McMahon with a full-time fire chief. On December 6, the council hired John Mallott for the position. Mallott is a professional fireman who had previously been living in a neighboring town. The hiring of Mallott stirred up considerable controversy within the fire department. Many department members believed that the fire department did not need a full-time chief. Other members were upset because the city had hired someone from outside the city rather than someone from within the fire department.
 
 
 4
 When Mallott became chief in January 1989, a volunteer firefighter position was vacant. David Horton, who had served as a volunteer from 1982 to 1986, applied for the position. After speaking with Horton, Mallott informed both Key and Holder that he intended to hire Horton. On March 21, 1989, Mallott recommended to the city council that Horton be hired as a firefighter. In accordance with its procedures, the city council deferred consideration of the recommendation until its next meeting, scheduled for April 4.
 
 
 5
 Having learned that Horton had been recommended for the firefighter position, plaintiff Busch spoke to Councilman Bill Wilson on March 31, 1989. Busch asked Wilson to make a motion to table the hiring of Horton for two weeks. According to Busch, he told Wilson that the fire department had a safety problem that would be taken care of in two weeks. According to Wilson, however, Busch did not mention any safety problem; rather, Busch said only that there had been some problems with Horton in the past. Wilson informed Busch that he would move to table the hiring but would need someone to second the motion.
 
 
 6
 The safety problem to which Busch allegedly referred concerned a new policy of City Light, Gas & Water (City Light), which had recently instructed the fire department not to disconnect electric and gas meters at fire scenes because it wanted only its employees to disconnect meters. Disconnecting the meters turns off a building's electricity and gas supply. Consequently, if a fire department officer wanted the meters disconnected from a building at a fire scene, he had to call City Light, which would then send one of its employees to disconnect them. Normally, the employee would arrive at the fire scene about fifteen minutes later. This policy created a problem for the firefighters, for they either had to postpone their firefighting until the City Light employee arrived or risk being injured by a live electric wire or a gas explosion.
 
 
 7
 On April 1, a number of the members of the fire department had breakfast at the fire station. As they were cleaning up afterwards, plaintiffs and Holder discussed some surplus firefighting equipment that Mallott had purchased since taking command. They thought the equipment was obsolete and dangerous. The four men also discussed the problem created by City Light's new policy. To solve the problem, they believed that the fire department needed to hire a City Light employee to disconnect meters. Busch informed the others that he had talked to Councilman Wilson about tabling the hiring of David Horton. He said that Wilson had agreed to make the motion but needed someone to second it. Key said that Councilman Cole might agree to second the motion.
 
 
 8
 Plaintiffs and Holder then went to see Cole at his place of business. They first told Cole that Mallott had purchased some equipment that they thought was unsafe. They also informed Cole about the fire department's need to hire someone authorized to disconnect meters. They said that a person who was currently working for City Light had applied for a firefighter position and that they believed he should be hired. They told Cole that Busch had spoken with Councilman Wilson about making a motion to table the hiring of David Horton and asked Cole to second the motion.
 
 
 9
 At the city council meeting on April 4, Wilson moved to table the hiring of Horton, stating that there had been problems with him in the past. Cole seconded the motion. Nonetheless, the motion was defeated, and the council voted to hire Horton. Over the next few days, Mallott learned that plaintiffs and Holder had asked Councilman Cole to table the hiring of Horton. Additionally, Mallott learned from Horton that one motive behind plaintiffs' visit to Cole was the desire to undermine Mallott's authority. Plaintiff Shands had told Horton that he had spoken with Cole to show Mallott that he [Mallott] could not get everything he wanted from the council. After obtaining the approval of Mayor Karsten and the fire department committee, Mallott dismissed plaintiffs and Holder on April 10. Their dismissal letters stated that they had been discharged for acts of insubordination and misconduct. The next day seventy-five percent of the Kennett firemen walked out in protest of the discharges.
 
 
 10
 The discharges and the walkout received considerable media coverage in Kennett. Linda Redeffer, a reporter for the Daily Dunklin Democrat, wrote a series of articles about the fire department following the discharges. In an April 11 interview, Mallott told Redeffer that the discharges were the result of "a personnel matter that was dealt with according to city policy." In a subsequent interview, Mallott told Redeffer that the men had been "insubordinate to a standing order to city policy." Mayor Karsten and Councilman Talley, chairman of the fire department committee, also spoke with Redeffer about the discharges and the walkout. In addition to speaking with Redeffer, Mallott told a television news reporter that the firemen had been discharged for acts of misconduct and insubordination.
 
 
 11
 On April 18, the four discharged firemen appeared at a city council meeting. Holder, acting as their spokesman, read a prepared statement, telling the council that they were not guilty of any wrongdoing. On May 4, the council held a special closed session to consider the discharges. Witnesses testified concerning the reasons for the discharges, and the dismissed firemen, with the aid of counsel, were allowed to question these witnesses and make their own statements. On May 14, the city council voted not to reinstate the four men. The council found that their attempt to interfere with the hiring of David Horton constituted a sufficient basis for their discharges. On May 17, the council released a statement to dispel rumors and misinformation concerning the discharges. The release stated that the discharged firemen had not been accused of or dismissed for any financial misdealings, illegal activities, or activities involving moral turpitude. Rather, the discharges were the result of fire department personnel matters.
 
 
 12
 Some two weeks later, plaintiffs filed this section 1983 action. In Count I, plaintiffs alleged that they had been discharged in retaliation for exercising their First Amendment right to free speech. In Count II, they alleged that defendants had deprived them of a Fourteenth Amendment liberty interest without due process of law. At the conclusion of a five-day trial, the jury returned verdicts in favor of all plaintiffs and against all defendants on both counts. Following the jury verdicts, defendants made a motion for judgment notwithstanding the verdict[1] and for a new trial. The district court denied the motion for a new trial, but granted judgment notwithstanding the verdict on both counts in favor of defendants.
 
 II.
 
 13
 We first consider whether the district court erred in granting defendants' motion for judgment notwithstanding the verdict on Count I, the First Amendment claim. Before addressing the specific issues raised by the First Amendment claim in this case, we outline the general framework for analyzing claims by public employees that they have been improperly discharged for exercising their right to free speech.
 
 
 14
 Whether a public employee's speech is protected by the First Amendment requires a two-step judicial inquiry. The first issue is whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983); Bausworth v. Hazelwood Sch. Dist., 986 F.2d 1197, 1198 (8th Cir.1993). If the speech addresses a matter of public concern, the court must balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Both of these questions are questions of law for the court. Connick, 461 U.S. at 148 n. 7, 150 n. 10, 103 S.Ct. at 1690 n. 7, 1691 n. 10.
 
 
 15
 Any underlying factual disputes concerning whether the plaintiff's speech is protected, however, should be submitted to the jury through special interrogatories or special verdict forms. Roberts v. Van Buren Pub. Schs., 773 F.2d 949, 954-55 (8th Cir.1985); Bennis v. Gable, 823 F.2d 723, 729 & n. 6 (3d Cir.1987). For example, the jury should decide factual questions such as the nature and substance of the plaintiff's speech activity, Bennis, 823 F.2d at 729, and whether the speech created disharmony in the work place, McGee v. South Pemiscot School District R-V, 712 F.2d 339, 342 (8th Cir.1983). The trial court should then combine the jury's factual findings with its legal conclusions in determining whether the plaintiff's speech is protected. Lewis v. Harrison Sch. Dist. No. 1, 805 F.2d 310, 315 (8th Cir.1986), cert. denied, 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987); Roberts, 773 F.2d at 955.
 
 
 16
 If any speech is found protected under the above analysis, the plaintiff must show that the protected speech was a substantial, or motivating, factor in the defendant's decision to discharge him. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). If the plaintiff meets this burden, the burden then shifts to the defendant to show by a preponderance of the evidence that the plaintiff would have been discharged regardless of the protected speech activity. Id. These two causation questions are questions of fact for the jury. Cox v. Dardanelle Pub. Sch. Dist., 790 F.2d 668, 675 (8th Cir.1986); Roberts, 773 F.2d at 954.
 
 
 17
 In this case, the district court failed to follow this framework. The court did not determine as a matter of law whether any of plaintiffs' speech was protected by the First Amendment, refusing plaintiffs' request that it instruct the jury that it had determined that plaintiffs' speech addressed matters of public concern. Rejecting plaintiffs' proffered special interrogatories and verdict forms, the court instructed the jury to determine whether any of plaintiffs' alleged speech activity was protected by the First Amendment. We, of course, must address this issue as a question of law. Because it is a question of law, we may address this issue for the first time on appeal. Roberts, 773 F.2d at 955. As this issue comes before us in a motion for judgment notwithstanding the verdict by defendants, we consider the evidence in the light most favorable to plaintiffs. See, e.g., K & S Partnership v. Continental Bank, N.A., 952 F.2d 971, 976-77 (8th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); McGee, 712 F.2d at 343.
 
 A. Connick Analysis
 
 18
 As outlined above, the initial question in determining whether an employee's speech is protected is whether the speech addressed a matter of public concern, that is, a matter of political, social, or other concern to the community. Connick, 461 U.S. at 146, 103 S.Ct. at 1689. In making this determination, we examine the content, form, and context of the speech, as revealed by the whole record. Id. at 147-48, 103 S.Ct. at 1690.
 
 
 19
 Plaintiffs spoke to Councilman Cole about three issues: (1) Mallott's purchase of firefighting equipment, (2) the fire department's need to hire someone to disconnect meters, and (3) the hiring of David Horton. The purchase of firefighting equipment and the department's need to hire someone to disconnect meters addressed matters of public concern; both topics implicated the quality and safety of the fire department. The purchase of firefighting equipment also implicated the manner in which the city was spending public funds.
 
 
 20
 The decision to hire David Horton, however, is not so easily characterized as a matter of public concern. Defendants argue that the decision to hire Horton was a personnel matter and therefore not a matter of public concern. Plaintiffs contend, however, that the decision to hire Horton was not purely a personnel matter because it was directly linked to and inseparable from the issue of hiring a firefighter to disconnect meters. According to plaintiffs, they wanted to postpone the hiring of Horton so that the city would hire someone authorized to disconnect meters.
 
 
 21
 Although the two issues are undoubtedly related, they are nonetheless separable. The four firemen could have informed Councilman Cole about the need to hire someone to disconnect meters without requesting that the question of hiring Horton be tabled. When they asked Cole to second the motion, they entered the realm of interfering with a government personnel decision, which is normally not a matter of public concern. Connick, 461 U.S. at 147, 103 S.Ct. at 1690. Their request to Cole, then, touched upon a matter of public concern only in a tangential, attenuated manner.B. Pickering Balance
 
 
 22
 Having found that two components of plaintiffs' speech directly addressed matters of public concern and that one component tangentially did, we must apply the Pickering test to plaintiffs' speech. As stated earlier, we balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. The Pickering "balance requires full consideration of the government's interest in effective and efficient fulfillment of its responsibilities to the public." Connick, 461 U.S. at 150, 103 S.Ct. at 1691. The government has a legitimate purpose in " 'promot[ing] efficiency and integrity in the discharge of official duties, and to mainta[in][ing] proper discipline in the public service.' " Id. at 150-51, 103 S.Ct. at 1691-92 (quoting Ex parte Curtis, 106 U.S. (16 Otto) 371, 373, 1 S.Ct. 381, 383, 27 L.Ed. 232 (1882)). As Justice Powell observed,
 
 
 23
 To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.
 
 
 24
 Id. 461 U.S. at 151, 103 S.Ct. at 1692 (quoting Arnett v. Kennedy, 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J., concurring)).
 
 
 25
 In balancing an employee's and an employer's competing interests, we weigh six interrelated factors:
 
 
 26
 (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.
 
 
 27
 Bowman v. Pulaski County Special Sch. Dist., 723 F.2d 640, 644 (8th Cir.1983) (citing Connick, 461 U.S. at 151-54, 103 S.Ct. at 1692-93). The Pickering balance is flexible, and the weight to be given to any one factor depends upon the specific circumstances of each case. Germann v. City of Kansas City, 776 F.2d 761, 764 (8th Cir.1985) (citing Egger v. Phillips, 710 F.2d 292, 319 (7th Cir.), cert. denied, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983)), cert. denied, 479 U.S. 813, 107 S.Ct. 63, 93 L.Ed.2d 22 (1986).
 
 
 28
 Applying the six Pickering factors to this case, we find that the balance tips in favor of defendants.
 
 1. The Need for Harmony in the Work Place
 
 29
 Plaintiffs argue that their speech is protected under the Pickering balance because defendants failed to show that the speech caused actual disruption within the fire department. Evidence of actual disruption, however, is not required in all cases. Germann, 776 F.2d at 765. Rather, the amount of disruption that a government employer must tolerate depends on several factors in the Pickering calculus: the extent to which the speech addresses a matter of public concern, Connick, 461 U.S. at 152, 103 S.Ct. at 1692, the type of service the employer provides, cf. Hughes v. Whitmer, 714 F.2d 1407, 1419 (8th Cir.1983), cert. denied, 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984), and the context of the speech, see Germann, 776 F.2d at 765.
 
 
 30
 As a public safety organization, a fire department, like a police department, has a more significant interest than the typical government employer in regulating the speech activities of its employees in order " 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence' " in its ability, Hughes, 714 F.2d at 1419 (quoting Gasparinetti v. Kerr, 568 F.2d 311, 315-16 (3d Cir.1977), cert. denied, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978)). Cf. Germann, 776 F.2d at 765 (holding that a fire captain's speech was not protected). "When lives may be at stake in a fire, an esprit de corps is essential to the success of the joint endeavor." Janusaitis v. Middlebury Volunteer Fire Dept., 607 F.2d 17, 26 (2d Cir.1979). Whether in a large professional department or in a small volunteer one like Kennett's, firemen must follow their superiors' orders and work together harmoniously to ensure their own and the public's safety. Accordingly, Mallott's decision to discharge plaintiffs is entitled to judicial deference on two levels. Cf. Hughes, 714 F.2d at 1419 (stating that police departments are entitled to judicial deference). First, his determination that the four firemen's speech had caused or would cause dissension and disruption is entitled to considerable judicial deference. Second, his response to the actual or perceived disruption--the discharge of the men--is likewise entitled to deference. Id.
 
 
 31
 Giving his decision due deference, we conclude that Mallott reasonably believed that the discharged firemen's speech was an attempt to undermine his authority and had led or would lead to disruption in the department. Of all the members of the fire department, plaintiffs and Holder possessed the greatest potential to undermine the chief's authority. As assistant fire chief and fire captain, respectively, Key and Holder were the only other officers in the department. Further, all four men were senior members of the department: Holder had been a fireman for twenty years; Busch for twenty-two years; Key for twenty-four years; and Shands for thirty years. Before going to Councilman Cole, the men never met directly with Mallott to discuss their concerns about the equipment or the need to hire someone to disconnect meters--even though Mallott had indicated to Key and Holder that he intended to hire Horton. Instead of discussing their concerns with Mallott, they circumvented the chain of command. Although plaintiffs deny that they intended to undermine him, Mallott had reason to believe otherwise. Shands told Horton that he had gone to Councilman Cole because he had wanted to show Mallott "that he [Mallott] could not have his way about every little thing." Upon receiving this information from Horton, Mallott became firmly convinced that he had a serious personnel problem and that he should discharge the four men.
 
 
 32
 2. Whether the Government's Responsibilities Require a Close Working Relationship
 
 
 33
 Plaintiffs argue that there was less potential for disruption in the fire department because they were not required to work closely with Mallott. They observe that, for the most part, they saw Mallott only at fires and department meetings. Although a close working relationship is an important factor in some cases, such as Connick, we have stated that a " 'blind insistence upon the presence of an intimate working relationship gives to Pickering precisely that rigidity and formalistic structure that the Court ... denied in Connick.' " Germann, 776 F.2d at 765 (quoting Gonzalez v. Benavides, 712 F.2d 142, 148 (5th Cir.1983)). In fact, in some cases, such as this one, the absence of a close working relationship requires that an employer be given more latitude in regulating the speech of an employee. Id. That is, in a volunteer fire department like Kennett's, where the fire chief does not closely supervise those under his command, personal loyalty to the chief is critical to the management structure of the fire department. See id. Mallott had to depend especially on Key and Holder, as his only officers, to support and implement his policies and orders.
 
 3. Time, Manner, and Place of the Speech
 
 34
 Plaintiffs argue that their speech is entitled to a heightened level of protection because they spoke privately with Cole on their own time. In Connick, the Supreme Court recognized that private expression by an employee on his own time and outside the work place may bring different factors into the Pickering calculus. Id. 461 U.S. at 152-53 & n. 13, 103 S.Ct. at 1692-93 & n. 13 (quoting Givhan v. Western Line Consolidated Sch. Dist., 439 U.S. 410, 415 & n. 4, 99 S.Ct. 693, 696 & n. 4, 58 L.Ed.2d 619 (1979)). In Rankin v. McPherson, the Court stated further that a purely private conversation will rarely justify a discharge of a public employee. 483 U.S. 378, 388 n. 13, 107 S.Ct. 2891, 2899 n. 13, 97 L.Ed.2d 315 (1987).
 
 
 35
 Although plaintiffs' conversation with Cole was private and on their own time, it was not like the conversation in Rankin, where an employee spoke privately to a co-worker. As Justice Powell recognized, the risk that a single private comment like the one in Rankin will disrupt the work place or lower morale is low. Id. at 393, 107 S.Ct. at 2901 (Powell, J., concurring). In Rankin, there was no suggestion that the employee's speech or ideas were going to reach the general public. Id. at 388, 107 S.Ct. at 2899. Conversely, in the case at hand, plaintiffs asked Cole to take public action. They had to expect that a request to table the hiring of Horton would raise questions and could potentially disrupt the fire department.
 
 4. The Context of the Dispute
 
 36
 As the Supreme Court recognized in Connick, the context of an employee's speech is significant. 461 U.S. at 153, 103 S.Ct. at 1693. The same employee speech may be protected in one context but not in another; an employee's speech that arises from a purely academic interest is entitled to more protection than speech that arises from a personal dispute with a government employer. Id. When employee speech arises from a dispute with a supervisor, "additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run" the department. Id.
 
 
 37
 Mallott had been fire chief for only three months when plaintiffs spoke to Councilman Cole. Shortly after Mallott had been hired, the members of the fire department held a special meeting at which the firemen seriously discussed walking out. Many of the men were disgruntled because they believed a full-time chief was not needed and that McMahon should have continued as a volunteer chief. They were also upset because the council had hired someone from out of town rather than someone from within the fire department. Indeed, at Mallott's first meeting with the department, many members indicated that they were upset because the council had not consulted them about the hiring of a full-time chief. With all the public debate and controversy surrounding his hiring, Mallott "felt like a political basketball."
 
 
 38
 We find that in these circumstances Mallott's decision to discharge the four firemen should be given considerable deference. Mallott knew that his authority as head of the fire department was not firmly established, and he acted to prevent his authority from being eroded further. He need not have waited until he had lost complete command of the fire department before reacting to the plaintiffs' and Holder's disruption and dissension. Connick, 461 U.S. at 151, 103 S.Ct. at 1692.
 
 
 39
 5. The Degree of Public Interest in the Speech
 
 
 40
 As already discussed under the Connick analysis, the fire department's purchase of equipment and its need for a firefighter to disconnect meters were matters of public interest. These issues, however, were not at the center of public debate; they had been discussed only within the fire department. Accordingly, we believe that the degree of public interest in plaintiffs' speech is outweighed by other factors in this case.
 
 
 41
 6. Whether the Speech Impeded the Plaintiffs' Ability to Perform Their Duties
 
 
 42
 There was no evidence that the speech hindered plaintiffs' ability to perform their duties as firemen. Nevertheless, this factor is not determinative. In Connick, the Court found that the employee's speech was not protected under the Pickering balance even though the employer had failed to demonstrate that the employee's speech had impeded her ability to perform her job responsibilities. Connick, 461 U.S. at 151, 103 S.Ct. at 1692.
 
 
 43
 Finding that the Pickering balance favors defendants, we hold that plaintiffs' speech, under the facts of this case, was not protected by the First Amendment. Accordingly, we affirm the judgment notwithstanding the verdict for the defendants on the First Amendment claim.
 
 III.
 
 44
 We next consider whether the district court erred in granting judgment notwithstanding the verdict on Count II, the procedural due process claim. Plaintiffs alleged in Count II that Mayor Karsten, Councilman Talley, and Mallott had made false and stigmatizing statements about them to the news media in connection with their discharge and thus implicated their Fourteenth Amendment liberty interests. They further alleged that defendants had deprived them of procedural due process by failing to provide a fair and meaningful hearing for them to publicly clear their names.
 
 
 45
 In their motion for judgment notwithstanding the verdict, defendants argued that plaintiffs had failed to show that any stigmatizing charges were made against them in connection with their discharges. Defendants also alleged that assuming, arguendo, that such charges had been made and had thereby implicated plaintiffs' liberty interests, defendants had nonetheless afforded plaintiffs procedural due process. The district court agreed with these arguments and granted defendants' motion.
 
 
 46
 A government employee is entitled to procedural due process in connection with being discharged from employment only when he has been deprived of a constitutionally protected property or liberty interest. See, e.g., Board of Regents of State Colleges v. Roth, 408 U.S. 564, 570-71, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Plaintiffs alleged that they were deprived of liberty interests. To establish protected liberty interests, plaintiffs were required to establish that a city official, in connection with discharging plaintiffs, publicly made allegedly untrue charges against them that would stigmatize them so as to seriously damage their standings and associations in their community, or foreclose their freedom to take advantage of other employment opportunities. Roth, 408 U.S. at 573-74, 92 S.Ct. at 2707; Paul v. Davis, 424 U.S. 693, 709-10, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); Bishop v. Wood, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976); Codd v. Velger, 429 U.S. 624, 626-28, 97 S.Ct. 882, 883-84, 51 L.Ed.2d 92 (1977); Hogue v. Clinton, 791 F.2d 1318, 1321-23 (8th Cir.), cert. denied, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986); Fowler v. United States, 633 F.2d 1258, 1262 (8th Cir.1980); Buhr v. Buffalo Pub. Sch. Dist. No. 38, 509 F.2d 1196, 1199 (8th Cir.1974).
 
 
 47
 As with defendants' motion on Count I, we examine the evidence in the light most favorable to the non-moving party. According to the record, Mallott was the only city official to make public statements directly concerning plaintiffs. In an interview with Linda Redeffer on April 11, 1989, Mallott said that the reason for the dismissals "was a personnel matter that was dealt with according to city policy." Also on April 11, Mallott told a television news reporter that plaintiffs had been discharged for acts of insubordination and misconduct. In a subsequent interview with Redeffer, Mallott said that plaintiffs had been dismissed because they "were insubordinate to a standing order to city policy." He explained, however, that they "were not insubordinate to a direct order from me."
 
 
 48
 We hold that these statements did not create the level of stigma required to implicate a constitutionally protected liberty interest. An employee's liberty interest is implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges. Kyles v. Eastern Neb. Human Servs., 632 F.2d 57, 61 (8th Cir.1980). The requisite stigma has generally been found in cases in which the employer has accused the employee of dishonesty, immorality, criminality, racism, or the like. Green v. St. Louis Housing Authority, 911 F.2d 65, 69 (8th Cir.1990) (quoting Harrison v. Bowen, 815 F.2d 1505, 1518 (D.C.Cir.1987)); Robinson v. City of Montgomery City, 809 F.2d 1355, 1356 (8th Cir.1987); Nathanson v. United States, 630 F.2d 1260, 1264-65 (8th Cir.1980) (per curiam). A charge of insubordination alone is normally insufficient to implicate a liberty interest. See Kyles, 632 F.2d at 61; Nathanson, 630 F.2d at 1264 (citing Ventetuolo v. Burke, 596 F.2d 476, 483 (1st Cir.1979)). Although misconduct could conceivably include accusations serious enough to implicate a liberty interest, the general allegation of misconduct in this case does not by itself rise to the level of constitutional stigma.
 
 
 49
 Plaintiffs argue, however, that Karsten, Talley, and Mallott made additional statements to Redeffer that did not specifically mention plaintiffs by name but nevertheless implied that plaintiffs had engaged in serious misconduct. Plaintiffs argue that these statements, when combined with Mallott's statement that plaintiffs had been discharged for misconduct, were sufficient to implicate by innuendo plaintiffs' liberty interests in their good names and reputations.
 
 
 50
 In analyzing plaintiffs' claim that they were stigmatized by innuendo, we focus primarily on the evidence concerning what the city officials actually told Redeffer, not on what Redeffer wrote. What appeared in print is relevant only in that it provides some evidence as to what the city officials said to Redeffer. After carefully examining the evidence concerning the content and context of each of these additional statements made to Redeffer, we find that plaintiffs' claim fails. Plaintiffs have failed to establish that any of the statements were made in connection with their discharges or seriously stigmatized them. Accordingly, the district court did not err in granting judgment notwithstanding the verdict on the procedural due process claim.
 
 
 51
 Our holding that the district court correctly granted judgment notwithstanding the verdict on both counts makes it unnecessary for us to discuss the other issues raised by the parties.
 
 
 52
 The judgment notwithstanding the verdict is affirmed.
 
 
 
 *
 The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation
 
 
 [1]
 Now entitled a motion for judgment as a matter of law. See Fed.R.Civ.P. 50(b) (as amended effective December 1, 1991)