# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3512
_____

Dr. Tara Gustilo, M.D.

*Plaintiff - Appellant*

v.

Hennepin Healthcare System, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: June 11, 2024
Filed: December 9, 2024

_____

Before LOKEN, ERICKSON, and GRASZ, Circuit Judges.

_____

LOKEN, Circuit Judge.

Dr. Tara Gustilo, an Asian American woman of Filipino descent, is an obstetrician-gynecologist physician. She graduated from Mayo Medical School in 1994 and completed her residency in obstetrics and gynecology at Duke University. In 2008, Dr. Gustilo began working in the Department of Obstetrics and Gynecology ("OBGYN Department") of Hennepin Healthcare System, Inc. ("HHS") (then called

Hennepin County Medical Center), a subsidiary of Hennepin County. See Minn. Stat. § 383B.901. She served as Department Chair from 2015 until April 2021, when she was demoted from that position. In February 2022, after filing charges relating to the demotion with the Equal Employment Opportunity Commission ("EEOC") and receiving permission to sue, Dr. Gustilo commenced this action against HHS, alleging race discrimination and retaliation/reprisal violations of Title VII of the Civil Rights Act of 1964 and the Minnesota Human Rights Act ("MHRA"), and deprivation of her First Amendment rights in violation of 42 U.S.C. § 1983.

Following extensive discovery, the district court granted HHS's motion for summary judgment, finding no genuine dispute of material fact as to the race discrimination, retaliation/reprisal, and First Amendment claims. Dr. Gustilo appeals. We review the grant of summary judgment *de novo*, viewing the facts in the light most favorable to Dr. Gustilo, the non-moving party. Goldsmith v. Lee Enters., Inc., 57 F.4th 608, 610 (8th Cir. 2023) (standard of review). We reverse the grant of summary judgment on the First Amendment retaliation claim and remand for further proceedings.

## I. Background

As Chair of the OBGYN Department, Dr. Gustilo was tasked with significant leadership, academic, and clinical responsibilities. Before 2020, she received generally positive performance reviews. In the spring of 2020, the COVID-19 pandemic and George Floyd's murder by Minneapolis police officers produced stress and conflict within the Department that led OBGYN physicians to question Dr. Gustilo's leadership.

-- In April 2020, the Mpls. St. Paul Magazine noted in a complimentary article that Dr. Gustilo posted in March a "OB/GYN Improvement" fundraising link on her public Facebook account, identifying herself as HHS's OBGYN Department Chair.

In the following months, Dr. Gustilo made a series of posts on that Facebook account concerning controversial political issues including presidential candidates, fascism, racism, police killings, Black Lives Matter, socialism, and COVID. She used the phrase "China virus" to refer to COVID-19 in one post, which some colleagues considered racist. In a September 2023 Declaration, Dr. Gustilo stated that in May 2020, "I began to educate myself on the Black Lives Matter movement, critical race theory ideology, police brutality, and the dissemination of information in the United States." She began to identify "as a classical liberal," advocating for civil liberties, economic and political freedom, and freedom of speech. "I also began to voice my opposition to critical race theory on my personal Facebook page, as well as in appropriate settings at HHS," because CRT theorists "reject the principle of equality under the law" and "warn[] people of color against 'internalized whiteness.'"

-- Also in April 2020, HHS cut midwife salaries as part of its budget reduction. Dr. Gustilo asked Department physicians to donate a portion of their salaries to the midwives. Most voted anonymously against the proposal. Dr. Gustilo then asked members to re-vote by sending personal emails. When the re-vote passed, some Department physicians were upset and felt pressured to vote for the proposal.

-- In the wake of George Floyd's murder in May 2020, a Department physician proposed sending a letter "that pledges our support for our patients." When Dr. Gustilo edited the draft letter to replace the word "unrest" with the word "riots" in discussing protests that occurred following the murder, several members "pushed back" against shifting the focus away from issues of inequality and injustice. As the only black OBGYN in the Department put it, our patients "want to know we are taking active steps to dismantle systemic racism within the healthcare system."

-- In June 2020, certain Department members participated in a rally at the State Capitol held by White Coats for Black Lives, a medical student-led organization advocating for racial justice. Dr. Gustilo supported participation but not if OBGYNs

displayed their affiliation with HHS while engaging in political activity. After the event, its organizers thanked HHS for participating. One speaker at the event had advocated for "defunding the police." Dr. Gustilo sent an email to Department providers opposing that idea and urging research in the future to avoid identifying HHS with controversial political stances. This resulted in multiple contrary replies and animated discussion.

-- At a July 2020 Board retreat, Dr. Gustilo allegedly said, "systemic racism ended in the '60's, so why are we still talking about it." On August 5, 2020, the HHS Board of Directors adopted a Declaration of Health Equity as a strategic priority, adapted from an Institute for Healthcare Improvement white paper. The Board resolved "that HHS will support local, state, regional, and federal initiatives that advance efforts to dismantle individual to institutional to systemic racism and will promote community efforts to amplify issues of racism and its impact on health."

-- In September 2020, four Department physicians approached Dr. David Hilden, then Vice President of Medical Affairs at HHS, to discuss concerns they had about Dr. Gustilo. According to Dr. Hilden, the physicians told him their division was "imploding" under Dr. Gustilo's leadership -- she would not listen to their concerns, was intimidating, and frequently lectured them about her personal views on issues that had nothing to do with the provision of care in a clinical setting, primarily the murder of George Floyd and COVID-19. They felt bullied by their boss and said they would leave HHS if Dr. Gustilo remained Chair. Following this meeting, Dr. Hilden and Chief Medical Officer Dr. Daniel Hoody met with Dr. Gustilo to present concerns raised by the four physicians. Dr. Hilden testified that Dr. Gustilo "was pretty defiant" -- she brought up politics, critical race theory, the presidential election, and police funding. After further inquiry and discussions with the complaining physicians and Dr. Gustilo, Dr. Hilden and Dr. Hoody hired Human Systems Dynamic Institute ("HSDI") to survey the OBGYN Department and assess the work environment under Dr. Gustilo.

-- The HSDI survey results were overwhelmingly negative. The final HSDI report indicated that, among other things, Gustilo was "chronically" late, did not attend meetings she scheduled, disparaged or rejected the perspectives and concerns of others in the Department, did not collaborate, and lashed out. OBGYN physicians expressed being "afraid or traumatized or triggered" in their personal interactions with Dr. Gustilo. Department members believed there was no way forward under Dr. Gustilo's leadership and threatened to leave HHS if she remained Chair. Shortly thereafter, HHS received the results from Dr. Gustilo's "360 review," a regularly-scheduled evaluation conducted in the middle of a Department Chair's five-year term. Dr. Hilden testified that Gustilo's review was "one of the worst ones on record . . . devastatingly bad," indicating she would not have been retained for a second term as Chair if she had not been demoted.

Following the HSDI report and 360 review, Dr. Gustilo attended several meetings with Dr. Hoody and Jennifer Hauff, HHS Human Resources Manager. Seeing "no path forward" with Dr. Gustilo as Chair, Dr. Hoody requested that she voluntarily step down. She refused, claiming that HHS was attempting to demote her because of her political beliefs in "opposition to the Marxist and racist Critical Race Theory ideology." She was placed on involuntary leave. Dr. Laura Nezworski, whom Dr. Gustilo described as "a good choice," became interim Department Chair.

At the last of several meetings in early 2021, Dr. Nezworski presented a letter signed by thirteen of the OBGYN Department's fourteen physicians stating they could not "return to a place . . . where [Dr. Gustilo] could regain [their] trust." Despite this mounting pressure, Dr. Gustilo declined to permanently step down. HHS then initiated its Chair removal procedures, a two-step process prescribed by the Medical Staff Bylaws. First, two-thirds of the members of HHS's Medical Executive Committee ("MEC") must vote for removal. If they do, the HHS Board must approve the MEC's vote. The action proposed was limited to removing Dr. Gustilo as

Department Chair. It would not affect her standing in the Department as an OBGYN physician with academic and clinical responsibilities.

Dr. Hilden scheduled a meeting to vote on Dr. Gustilo's removal. Before the April 13 MEC meeting, he provided MEC voting members with an information packet he created (the "Hilden Packet") and a packet Dr. Gustilo prepared. The Hilden Packet included communications with other HHS physicians regarding concerns about Dr. Gustilo, emails between Dr. Gustilo and other Department members, Dr. Gustilo's performance reviews, and the HSDI report. The Hilden Packet contained numerous references to Dr. Gustilo's controversial Facebook posts. After discussion, the MEC voted to remove Dr. Gustilo by a vote of twenty-five to one, with Dr. Gustilo casting the only contrary vote.

Following the MEC vote, Dr. Hilden sent a memorandum ("Hilden Memo") to the Board outlining the "basis for [the MEC] decision." The Hilden Memo listed five reasons why the MEC voted to remove Dr. Gustilo as Department Chair:

> [1] Dr. Gustilo had lost the support of her colleagues which is a critical element of being a departmental leader and necessary for the continued success of the department [2] As a Department Chair, Dr. Gustilo had raised issues at work that are not related to the job duties and ultimately negatively impacted the staff and created a poor environment in the department [3] As a leader, Dr. Gustilo had not accepted responsibility, but rather blamed staff without apology [4] Dr. Gustilo failed to change and adapt to the environment in ways needed to support the team [5] Dr. Gustilo was not meeting critical elements of the Chair's job responsibilities.

There is no evidence the Board received anything besides the Hilden Memo prior to the meeting. We think there can be little doubt that item [2] referred at least in part to issues raised in Dr. Gustilo's Facebook posts, about which Department physicians had repeatedly complained as the full Hilden Packet made clear. In addition, two

-6-

members of the Board were also members of the MEC and therefore knew that media posts were a significant part of what was viewed as Dr. Gustilo's leadership failures. On April 28, the Board unanimously approved Dr. Gustilo's removal as Chair.

Dr. Gustilo then filed a Title VII charge with the EEOC, claiming that HHS retaliated and discriminated against her because she opposed CRT and held beliefs different from those expected of her as a woman of color. This litigation commenced after Dr. Gustilo received a right to sue letter. Dr. Gustilo now appeals the district court's grant of summary judgment dismissing her claims of race discrimination and retaliation under Title VII and the MHRA and her First Amendment retaliation claim under § 1983.

## II. Discussion

**A. The First Amendment Retaliation Claim.** Count III of the Complaint alleges that Dr. Gustilo "engaged in a constitutionally protected activity when she expressed her opinions on her personal Facebook page;" that this protected activity "was a substantial and motivating factor" in her demotion; and that the demotion "was done upon recommendation from the [MEC] and was formally adopted and approved by the HHS Board of Directors," making it an "official action of the final policy making authority of HHS."

Municipal liability under § 1983 attaches when a municipal official possessing final authority with respect to the action makes "a deliberate choice to follow a course of action . . . from among various alternatives." Soltesz v. Rushmore Plaza Civic Ctr., 847 F.3d 941, 946 (8th Cir. 2017) (quotation omitted). When a subordinate makes a decision that is subject to review, and the municipality's authorized policymakers approve the subordinate's decision "*and the basis for it*," their ratification is "chargeable to the municipality because their decision is final." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (emphasis added). The identification of final

policymakers is a question of law to be decided before a case is submitted to the jury; ratification is a question of fact for the jury. Soltesz, 847 F.3d at 946-47. Here, the parties do not dispute that the HHS Board was the final policy maker that approved the subordinate MEC's decision to demote Dr. Gustilo. They dispute whether the Board also approved the basis of the MEC's decision, which included consideration of her Facebook posts, the allegedly protected speech.

The district court granted summary judgment dismissing this § 1983 claim. While municipal policymakers can create municipal liability by "ratifying the actions of a subordinate," the court acknowledged, "Gustilo fails to create a genuine issue of material fact regarding whether the HHS Board considered her Facebook posts in making its decision to demote her." Gustilo v. Hennepin Healthcare Sys., Inc., No. 022CV00352, 2023 WL 7001735, at *13 (D. Minn. Oct. 24, 2023).

On appeal, Dr. Gustilo argues the court erred in finding no material fact dispute regarding the ratification issue. She argues there is substantial evidence in the summary judgment record that the Board approved the MEC decision *and* the basis for that decision. She points to Dr. Hilden's Rule 30(b)(6) deposition, where he testified that "the board of directors approved [the MEC's decision] in a roll call vote," including the basis for that decision. HHS responds that, as Dr. Hilden testified, "the basis [of the MEC decision] was laid out . . . in the [Hilden Memo] we gave to the board of directors . . . in five bullet points;" the Hilden Memo did not reference or list Gustilo's Facebook posts as a basis for her demotion; there is no evidence the Board received anything besides the Hilden Memo prior to the meeting; and there is no evidence that Board members considered Gustilo's posts when voting to approve the MEC's decision to demote Dr. Gustilo.

Though there is record support for HHS's contention, the difficulty, as we see it, is that ratification is an issue of fact for a jury if there is a material fact dispute. The district court concluded that Dr. Gustilo's evidence did not raise a material fact

dispute. The court noted, "[e]ven where there is evidence in the record that members of a board serving as the final decision-maker knew about the plaintiff's at-issue speech, this Court has found such knowledge alone insufficient to imply that the plaintiff's speech was the basis for the decision," citing its earlier, highly relevant decision in Benner v. St. Paul Public Schools, I.S.D. #625, 380 F. Supp. 3d 869, 908-09 (D. Minn. 2019). Id. at *13. But Benner was an interlocutory order granting in part defendants' motion for summary judgment, an order that was subject to reconsideration by the district court as that case progressed, and subject to appellate review if incorporated in a final order or judgment.

Here, on a summary judgment record, the fact-based ratification issue is open to question. As previously noted, the second of Dr. Hilden's five "bullet points" almost certainly referred to issues raised in Dr. Gustilo's Facebook posts. Dr. Hilden's Packet made clear that the Department OBGYN physicians had repeatedly complained about the media posts and Dr. Gustilo's aggressively pursuing those issues at work. Moreover, the district court did not acknowledge, and may not have been aware, that two members of the Board were also members of the MEC and therefore knew from the Hilden Packet that media posts were a significant part of what was viewed as Dr. Gustilo's leadership failures, even though the Hilden Memo carefully avoided any specific mention of the media posts. Thus, the summary judgment record does not support the district court's conclusion that, "[r]egardless of whether the MEC considered Gustilo's Facebook posts, Gustilo fails to create a genuine issue of material fact regarding whether the HHS Board considered her Facebook posts in making its decision to demote her." Id.

We conclude that ratification is a fact issue that cannot be decided as a matter of law on this summary judgment record. Therefore, we must remand for further consideration of ratification and other legal issues, beginning with whether Dr. Gustilo's Facebook posts are protected speech, and perhaps the development of a full record if the ratification and other issues require a trial.

The additional threshold question whether Dr. Gustilo's media posts are First Amendment protected was not addressed by the district court and warrants comment. The governing standard is well established but difficult to apply:

> Whether a public employee's speech is protected by the First Amendment requires a two-step judicial inquiry. The first issue is whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." Connick v. Myers, 461 U.S. 138, 146 (1983). If the speech addresses a matter of public concern, the court must balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568 (1968). Both of these question are questions of law for the court. Connick, 461 U.S. at 148 n.7.
>
> Any underlying factual disputes concerning whether the plaintiff's speech is protected, however, should be submitted to the jury through special interrogatories or special verdict forms.

Shands v. City of Kennett, 993 F.2d 1337, 1342 (8th Cir. 1993) (cleaned up), cert. denied, 510 U.S. 1072 (1994); see Garcetti v. Ceballos, 547 U.S. 410, 417-18 (2006).

Here, there can be little doubt that the subjects addressed in Dr. Gustilo's media posts were matters of public concern. That means the district court will need to apply the flexible Pickering balancing test; to do that, we weigh six interrelated factors. See Bowman v. Pulaski Cnty. Special Sch. Dist., 723 F.2d 640, 644 (8th Cir. 1983), citing Connick, 461 U.S. at 151-54. This is a complex task. See, e.g., Shands, 993 F.2d at 1344-46. In the district court, HHS argued that at least two of those factors "weigh decisively in HHS's favor," an assertion we decline to take up on appeal.

-10-

**B. The Title VII and MHRA Claims.**  Dr. Gustilo also appeals the district court's grant of summary judgment dismissing her Title VII and MHRA claims of unlawful race discrimination and retaliation/reprisal.[1]

Counts I and IV of the Complaint allege that HHS is liable for unlawful race discrimination because Dr. Gustilo was qualified to be Department Chair and was demoted under circumstances giving rise to an inference of discrimination.  See 42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363A.08, subd. 2.  The district court granted summary judgment dismissing these claims because Dr. Gustilo presented no direct evidence of race discrimination and "does not make out a prima facie case of discrimination" -- "she does not demonstrate or explain how her race is connected to the adverse employment action such that discrimination can be inferred."  Gustilo, 2023 WL 7001735, at *9.  Counts II and V of the Complaint assert retaliation and reprisal violations of Title VII and the MHRA.  See 42 U.S.C. § 2000e-3(a); Minn. Stat. § 363A.15(1).  The district court dismissed these claims, finding no evidence that Dr. Gustilo opposed an unlawful employment practice or that HHS was aware that she opposed its proposed "culturally congruent care" program.  Id. at *10-12.

We have jurisdiction over this appeal because the district court's Memorandum, Decision and Order dismissing all of Dr. Gustilo's claims was a "final decision[]."  28 U.S.C. § 1291.  We have now reversed the dismissal of her First Amendment retaliation claim and are remanding the case to the district court for further proceedings.  "In general, a pretrial order dismissing less than all of a plaintiff's claims is interlocutory and cannot be appealed unless it includes the grant or denial of an injunction, see § 1292(a)(1); or the district court has certified a

---

[1]The district court applied the same standards to Dr. Gustilo's Title VII and MHRA race discrimination claims because they are "based on identical facts and theories."  Yang v. Robert Half Int'l, Inc., 79 F.4th 949, 964 (8th Cir. 2023); see Guimaraes v. SuperValu, Inc., 674 F.3d 962, 977 (8th Cir. 2012) (same Title VII and MHRA standards for retaliation/reprisal claims).

-11-

controlling issue of law under 28 U.S.C. § 1292(b); or the court has directed entry of a partial final judgment with the determination required by Rule 54(b) of the Federal Rules of Civil Procedure; or the interlocutory order is appealable under the narrow, judicially created 'collateral order' doctrine." Great River Coop. v. Farmland Indus., 198 F.3d 685, 687-88 (8th Cir. 1999).

None of those exceptions to the governing finality principles apply here. Thus, our decision on the First Amendment retaliation claim has made our review of the Title VII and MHRA claims interlocutory. On remand, the district court will have discretion to revisit the grants of summary judgment on this record based, for example, on a changed or expanded pretrial record, or on the evidence presented at trial. "When a district court is convinced that it incorrectly decided a legal question in an interlocutory ruling, the district court may correct the decision to avoid later reversal." Lovett v. Gen. Motors Corp., 975 F.2d 518, 522 (8th Cir. 1992). Any summary judgment ruling the district court includes in its final order will then be reviewable on appeal. For these reasons, we will exercise our appellate discretion not to review at this time what are now interlocutory district court summary judgment rulings on Dr. Gustilo's Title VII and MHRA claims.

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

_____