# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3398
_____

Steven Melton

*Plaintiff - Appellant*

v.

City of Forrest City, Arkansas; Cedric Williams, In his official and individual capacities

*Defendants - Appellees*

------------------------------

Douglass Leadership Institute; The Radiance Foundation; Speak for Life

*Amici on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Northern
_____

Submitted: October 30, 2024
Filed: August 13, 2025
_____

Before SMITH, ERICKSON, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Does a Forrest City fireman who lost his job because he posted a provocative image on his personal Facebook page have a First Amendment retaliation claim that can get to a jury? We conclude that he does.

## I.

Steven Melton is a pro-life, evangelical Christian. In June 2020, he reposted a black-and-white image on Facebook that depicted a silhouette of a baby in the womb with a rope around its neck. His intent was to convey that he was "anti-abortion."



Others did not view the image the same way. Two weeks after he posted it, a retired fire-department supervisor complained to Melton that he thought it looked like a noose around the neck of a black child. It upset him because the caption of the image, "I can't breathe!," was associated with the protests surrounding George Floyd's death. Melton agreed to delete it immediately.

Deleting it was not enough for Mayor Cedric Williams, who called him into his office the next day. Although Melton was "apologetic," the mayor placed him on administrative leave pending an investigation. After a single day reviewing

Melton's Facebook page and discussing the post with the current fire chief, two retired firefighters, several attorneys, and a human-resources officer, the mayor decided to fire Melton over the image's "egregious nature."

He was concerned about the "huge firestorm" it had created. Among other things, the fire chief's phone had been "blowing up," "several" police officers had become "very upset," and the "phone lines" were jammed with calls from angry city-council members and citizens. Some said that Melton "should not be a part of the . . . fire department responding to calls." A few even said that they did not want "him coming to their house . . . for a medical call or fire emergency." According to the mayor, these complaints "threaten[ed] the City's ability to administer public services."

Melton found out about the decision to fire him from the local news. In response to a "media request," Mayor Williams had issued a press release stating that "[q]uestionable social[-]media posts" had led to his termination. It marked the end of his "four and a half years" of "unblemished" service.

After a grievance failed to get Melton his job back, he brought a First Amendment retaliation claim against Mayor Williams in both his individual and official capacities. *See* 42 U.S.C. § 1983. He also included one against Forrest City for what he alleged was an unwritten policy granting city officials unbridled discretion to censor employee speech.

The parties filed cross-motions for summary judgment, which prompted the district court to dismiss Melton's case. *See* Fed. R. Civ. P. 56. Qualified immunity shielded Mayor Williams in his individual capacity, and the lack of an unwritten policy doomed the official-capacity and unbridled-discretion claims. He hopes to revive his lawsuit on appeal.

II.

We review the district court's decision on cross-motions for summary judgment de novo. *See Couch v. Am. Bottling Co.*, 955 F.3d 1106, 1108 (8th Cir. 2020). "Summary judgment is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted). A genuine issue for trial exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A.

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (citation omitted); *see Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002) ("Retaliation by a government actor in response to . . . an exercise of First Amendment rights forms a basis for § 1983 liability."). Melton's position is that Mayor Williams is liable in his individual capacity because he admitted that the Facebook post itself, and the "firestorm" it created, was the reason for firing him. *See Mayfield v. Mo. House of Representatives*, 122 F.4th 1046, 1052 (8th Cir. 2024). Evaluating this argument requires us to consider qualified immunity, the availability of which depends on our answers to two questions. "First, did [the mayor] violate a constitutional right?" *Molina v. City of St. Louis*, 59 F.4th 334, 337 (8th Cir. 2023). And "[s]econd, was the right clearly established?" *Id.* at 337–38.

The district court never made it past the first one. What was missing, in its view, was "constitutionally protected [First Amendment] activity." *Naucke*, 284 F.3d at 927−28 (citation omitted); *see Molina*, 59 F.4th at 338. The general rule is that a statement expressing a viewpoint on a moral or political issue is protected under the First Amendment, regardless of whether others find it offensive. *See*

-4-

*Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (recognizing "social media" as one of "the most important places" for the "exercise of First Amendment rights"). Special rules apply, however, when the speaker is a public employee like Melton, which is why the district court thought his post was unprotected. *See Garcetti v. Ceballos*, 547 U.S. 410, 417, 419 (2006).

It asked the right questions, even if it ended up with the wrong answer. Public employees "must," according to the Supreme Court, "accept certain limitations on [their] freedom," *id.* at 418, because the government has valid "interests as an employer in regulating the[ir] speech," *Connick v. Myers*, 461 U.S. 138, 140 (1983). Recognizing, however, that they "do not surrender *all* their First Amendment rights by reason of their employment," the Court has staked out a middle ground. *Garcetti*, 547 U.S. at 417 (emphasis added). Known as *Pickering* balancing, it requires weighing the government's interest "in promoting the efficiency of the public services it performs through its employees" against the employee's interest "in commenting upon matters of public concern." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Courts weigh these interests on a post hoc basis, long after the speech and the alleged retaliation have come and gone. It is no easy task.

Getting there even involves addressing a couple of threshold issues, one for each side. For Melton, he can bring a claim for retaliation only if he was speaking "as a citizen on a matter of public concern." *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020) (citation omitted). Then the focus shifts to the government employer to establish that the speech "created workplace disharmony, impeded [Melton's] performance, . . . impaired working relationships," or otherwise "had an adverse impact on the efficiency of the [fire department's] operations." *Id.* at 1011–12 (citation omitted). Only if both are true will we do a full *Pickering* balancing and weigh these interests against each other. *See id.* at 1011.

The record is clear on the first issue. Melton posted the image to his personal page on his own time, and there is no dispute that race and abortion are matters of "political, social, or other concern to the community." *Id.* at 1012 (citation omitted);

*see Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 300 (2022) (noting that abortion is a "matter[] of great social significance and moral substance"); *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."). From there, the "possibility of a First Amendment claim ar[ose]," *Garcetti*, 547 U.S. at 418, out of the "individual and public interest[]" in Melton's speech, *id.* at 430 (Souter, J., dissenting).

The record is more of a tossup on whether there was a negative impact on Forrest City's delivery of "public services." *Pickering*, 391 U.S. at 468. Sometimes a government employer will experience an actual disruption. Other times, it will have a "reasonabl[e] belie[f]" in "the *potential* for disruption." *Washington v. Normandy Fire Prot. Dist.*, 272 F.3d 522, 527 (8th Cir. 2001) (emphasis added). Either is usually enough when the government entity is a public-safety organization. *See id.* But when neither is present, there are "no government interests in efficiency to weigh" and *Pickering* balancing "is unnecessary." *Henry*, 950 F.3d at 1011 (citation omitted); *see Mayfield*, 122 F.4th at 1055 ("Defendants bear the burden of putting the *Pickering* balancing test into play by submitting evidence of disruption.").

At best, the evidence of disruption is thin. As the district court pointed out, everyone agrees "that there was no disruption of training at the fire department, or of any fire service calls, because of the post or the controversy surrounding it." Instead, Mayor Williams argues that the "firestorm" itself is what "disrupted the work environment." *Grantham v. Trickey*, 21 F.3d 289, 295 n.4 (8th Cir. 1994). "[S]everal" police officers and city-council members were upset and "phone lines [were] jammed" with calls from concerned citizens. A few opposed Melton's continued employment as a firefighter and did not want him "coming to their house . . . for a medical call or fire emergency." These calls seemed to be the main motivation for firing Melton.

The problem is that there was no showing that Melton's post had an impact on the fire department itself. No current *firefighter* complained or confronted him about it. Nor did any co-worker or supervisor refuse to work with him. Granting summary judgment based on such "vague and conclusory" concerns, without more, runs the risk of constitutionalizing a heckler's veto. *Sexton v. Martin*, 210 F.3d 905, 912 (8th Cir. 2000); *see Kincade v. City of Blue Springs*, 64 F.3d 389, 398 (8th Cir. 1995) (holding that "bare allegations" that employee speech "caused the City problems" and "affected . . . efficiency" were not enough to demonstrate disruption). Enough outsider complaints could prevent government employees from speaking on any controversial subject, even on their own personal time. *See Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 554 (6th Cir. 2020) (Murphy, J., concurring). And all without a showing of how it *actually* affected the government's ability to deliver "public services"—here, fighting fires and protecting public safety. *Henry*, 950 F.3d at 1011–12 (requiring "specificity" about how the "speech at issue created workplace disharmony, impeded the plaintiff's performance, or impaired working relationships" (citation omitted)).

Much of what remained was predictive. Mayor Williams claimed, for example, that "conveying racist messages against Black people [would] affect trust between firefighters." To provide a "reasonable prediction[]" sufficient to take the case away from a jury, a decisionmaker must do more than make a vague statement in response to a conditionally worded question about what *could* happen. *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion); *see Burnham v. Ianni*, 119 F.3d 668, 680 (8th Cir. 1997) (en banc). When the record and the prediction do not match, it will usually be up to the jury to resolve the discrepancy and determine whether the prediction was reasonable enough to be entitled to "substantial weight." *Waters*, 511 U.S. at 673 (plurality opinion).

What the district court should not have done was automatically give the mayor's belief "considerable judicial deference." *Shands v. City of Kennett*, 993 F.2d 1337, 1345 (8th Cir. 1993). As one of our cases puts it, "we have never granted any deference to a government supervisor's bald assertions of harm based on

conclusory hearsay and rank speculation." *Burnham*, 119 F.3d at 680. Keep in mind that, in addition to the lack of evidence supporting the mayor's prediction, his brief investigation could lead a reasonable jury to conclude that what he said masked the true reason for Melton's firing, which was a disagreement with the viewpoint expressed in the image. *See Waters*, 511 U.S. at 673 (plurality opinion). The jury's role will be to resolve these factual disputes "through special interrogatories or special verdict forms." *Shands*, 993 F.2d at 1342. The district court can then decide, based on "the jury's factual findings," whether Melton's speech was protected. *Id.* at 1342–43 (outlining the "general framework for analyzing claims by public employees" of improper discharge "for exercising their right to free speech").

If the First Amendment protects Melton's speech, one last hurdle remains: any constitutional violation must have been "clearly established." *Molina*, 59 F.4th at 338. The jury's findings will play a role in making that determination too. Insufficient evidence of a disruption would be "fatal to the claim of qualified immunity" because there would be no governmental interest to weigh. *Belk v. City of Eldon*, 228 F.3d 872, 882 (8th Cir. 2000); *see Washington*, 272 F.3d at 527 ("Because the [employer's] showing of actual or potential disruption is insufficient to trigger the *Pickering* balancing test, the[] claim of qualified immunity fails."); *Burnham*, 119 F.3d at 680 (holding that the employer's "failure to establish workplace disruption . . . is fatal to his claim of qualified immunity under a *Pickering* analysis"). If the jury finds sufficient evidence of disruption to get to *Pickering* balancing, on the other hand, then "the asserted First Amendment right [is] rarely considered clearly established." *Grantham*, 21 F.3d at 293 (citation omitted); *cf. Sexton*, 210 F.3d at 914 (holding that the constitutional violation was clearly established despite having to conduct the *Pickering* balancing). Resolving this issue will determine whether Melton's retaliation claim can succeed.[1]

---

[1]He brought one against Forrest City too, but it is liable only if Melton's dismissal can be tied to "municipal policy." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Some evidence suggests that Mayor Williams effectively exercised policymaking authority over personnel matters, but the district court never addressed this fact-intensive question. If the court finds a First Amendment

B.

One final loose end. Melton alleges that Forrest City continues to violate the First Amendment by maintaining an "unwritten speech policy that gives unbridled discretion to [the mayor] to scrutinize city employees' speech." Unbridled-discretion claims are a special type of facial challenge available to individuals whose ability to speak depends on government approval. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988). That is, they apply to prior restraints designed to "suppress *future* speech." *Viewpoint Neutrality Now! v. Bd. of Regents of Univ. of Minn.*, 109 F.4th 1033, 1043 (8th Cir. 2024); *see City of Lakewood*, 486 U.S. at 757 (explaining the "evils" associated with "the power of prior restraint").

There is no suggestion that Forrest City employees require pre-approval to post on their personal social-media pages. *See Viewpoint Neutrality Now!*, 109 F.4th at 1043. On the contrary, Melton first posted the image on Facebook without asking, the post stayed on his page for two weeks, and only then did Mayor Williams discipline him. *If* an unwritten policy exists here, at *most* it allows Forrest City officials to intervene later, once the speech is publicly available. Given that facial challenges are "disfavored," *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 337 (8th Cir. 2011), we decline to extend the unbridled-discretion doctrine to cover after-the-fact actions taken against government employees for their speech, which is already the domain of First Amendment retaliation claims, *see Viewpoint Neutrality Now!*, 109 F.4th at 1038 (explaining that the doctrine is "inapposite" to a challenge to a "one-time decision").

---

violation, it will then need to determine whether municipal policy led to the decision, based on "state and local positive law, as well as custom or usage having the force of law." *Felts v. Green*, 91 F.4th 938, 942 (8th Cir. 2024) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)); *see Davison v. City of Minneapolis*, 490 F.3d 648, 659–662 (8th Cir. 2007).

## III.

We accordingly reverse the grant of summary judgment on the First Amendment retaliation claims against Mayor Williams and Forrest City, otherwise affirm, and remand for further proceedings.

_____